[No. S095992. Feb. 28, 2002.]

MORGAN VICTOR MANDULEY et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

MICHAEL ROSE et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

538

## COUNSEL

William J. LaFond; Kerry L. Steigerwalt; and Charles M. Sevilla for Petitioner Morgan Victor Manduley.

Haus & Damiani and Lisa J. Damiani for Petitioner Steven James DeBoer.

Patrick Q. Hall for Petitioner Kevin Scott Williams.

Timothy A. Chandler, Alternate Public Defender, Mary Ellen Attridge and Jose H. Varela, Deputy Alternate Public Defenders, for Petitioner Adam Mitchell Ketsdever.

Michael D. McGlinn for Petitioner Jason Wayne Beever.

Steven J. Carroll, Public Defender, Gary R. Nichols, Stewart Dadmun and Jo Pastore, Deputy Public Defenders, for Petitioner Michael Anthony Rose.

Marc B. Geller for Petitioner Nicholas Paul Fileccia.

Bardsley & Carlos, Francis J. Bardsley and Judith A. Litzenberger for Petitioner Bradley Hunter Davidofsky.

Howard, Rice, Nemerovski, Canady, Falk & Rabin, Steven L. Mayer, Kimberly A. Proctor, Erick M. Silber; Robert Kim, Margaret C. Crosby; Mark D. Rosenbaum; Jordan C. Budd for American Civil Liberties Union of Northern California, America Civil Liberties Union of Southern California, American Civil Liberties Union of San Diego and Imperial Counties, League of Women Voters of California, California Teachers Association, Children's Advocacy Institute, Coleman Advocates for Children and Youth and Pacific Juvenile Defender Center as Amici Curiae on behalf of Petitioners.

John T. Philipsborn for California Attorneys for Criminal Justice as Amicus Curiae on behalf of Petitioners.

James F. Sweeney for California Catholic Conference as Amicus Curiae on behalf of Petitioners.

Munger, Tolles & Olson, Jeffrey L. Bleich, Deborah N. Pearlstein; Lawyers Committee for Civil Rights of the San Francisco Bay Area, Robert Rubin and Rebekah B. Evenson for The Center on Juvenile and Criminal Justice, The National Center for Youth Law, Legal Services for Children, The National Association of Counsel for Children, The American Society for Adolescent Psychiatry, The American Academy of Child and Adolescent Psychiatry, The Center for Young Women's Development, The Trauma Foundation, The Asian Law Caucus, The Ella Baker Center for Human Rights and Children Now as Amici Curiae on behalf of Petitioners.

Elissa Barrett; Rohde & Victoroff and Stephen F. Rohde for Progressive Jewish Alliance as Amicus Curiae on behalf of Petitioners.

Earl Warren Legal Institute and Franklin E. Zimring for Law Professors and Juvenile Justice Specialists Elizabeth Cauffman, Laurence Steinberg, Dean Hill Rivkin, Jeffrey Fagan, Darrell F. Hawkins, Peter Edelman, Jan C. Costello, Mercer Sullivan, Elizabeth Scott and William Patton as Amici Curiae on behalf of Petitioners.

Akin, Gump, Strauss, Hauer & Feld, William A. Norris, Edward P. Lazarus and Jonathan Gottlieb for Los Angeles County Bar Association, Beverly Hills Bar Association, Culver Marina Bar Association, Bar Association of San Francisco, Women Lawyers Association of Los Angeles, Criminal Courts Bar Association, Mexican American Bar Association and Los Angeles Chapter of the National Association of Counsel for Children as Amici Curiae on behalf of Petitioners.

Carla J. Johnson; Daniel M. McGuire and Debra A. Gutierrez-McGuire for Criminal Defense Attorneys of Michigan as Amicus Curiae on behalf of Petitioners.

Mark I. Soler, Michael Finley; Laval Miller-Wilson and Marsha Levick for Youth Law Center, Juvenile Law Center, Children's Defense Fund, Child Welfare League of America, National Council of La Raza, National Mental Health Association, National Urban League and The Sentencing Project as Amici Curiae on behalf of Petitioners.

Ron Boyer, Deputy Public Defender (Contra Costa) for California Public Defenders Association as Amicus Curiae on behalf of Petitioners.

No appearance for Respondent.

Paul J. Pfingst, District Attorney, Thomas F. McArdle, Hector M. Jiminez and Anthony Lovett, Deputy District Attorneys, for Real Party in Interest.

Kent S. Scheidegger and Charles L. Hobson for Criminal Justice Legal Foundation as Amicus Curiae on behalf of Real Party in Interest.

Gary T. Yancey, District Attorney (Contra Costa) and L. Douglas Pipes, Deputy District Attorney, for California District Attorneys Association as Amicus Curiae on behalf of Real Party in Interest.

Bill Lockyer, Attorney General, David P. Druliner and Robert R. Anderson, Chief Assistant Attorneys General, Gary W. Schons, Assistant Attorney General, Laura Whitcomb Halgren, Raquel M. Gonzalez and Patti W. Ranger, Deputy Attorneys General, as Amici Curiae.

---

**OPINION**

**GEORGE, C. J.**—Proposition 21, titled the Gang Violence and Juvenile Crime Prevention Act of 1998 and approved by the voters at the March 7,

2000, Primary Election (Proposition 21), made a number of changes to laws applicable to minors accused of committing criminal offenses. As relevant here, the initiative measure broadened the circumstances in which prosecutors are authorized to file charges against minors 14 years of age and older in the criminal division of the superior court, rather than in the juvenile division of that court. Welfare and Institutions Code section 707, subdivision (d) (section 707(d)),[1] confers upon prosecutors the discretion to bring specified charges against certain minors directly in criminal court, without a prior adjudication by the juvenile court that the minor is unfit for a disposition under the juvenile court law.

Petitioners are eight minors accused of committing various felony offenses.[2] As authorized by section 707(d), the People filed charges against petitioners directly in criminal court. Petitioners demurred to the complaint, contending that section 707(d) is unconstitutional on several grounds. The superior court overruled the demurrers, but the Court of Appeal, Fourth Appellate District, issued a writ of mandate directing the superior court to vacate its ruling and to sustain the demurrers. The Court of Appeal (by a two-to-one vote) held that section 707(d) violates the separation of powers doctrine (Cal. Const., art. III, § 3) by allowing the prosecutor to interfere with the court's authority to choose a juvenile court disposition for minors found to have committed criminal offenses.

In considering the validity of the Court of Appeal's decision, we emphasize that this court is not confronted with any question regarding the wisdom of authorizing the prosecutor, rather than the court, to decide whether a minor accused of committing a crime should be treated as an adult and subjected to the criminal court system. In the present case, rather, we must decide whether section 707(d) satisfies minimum constitutional requirements; we are not called upon to resolve the competing public policies implicated by the measure, considered by the electorate when it voted upon Proposition 21, and discussed at length by numerous amici curiae who have filed briefs in support of petitioners or the People. As we shall explain, we conclude that a prosecutor's decision to file charges against a minor in criminal court pursuant to section 707(d) is well within the established charging authority of the executive branch. Our prior decisions instruct that the prosecutor's exercise of such charging discretion, before any judicial proceeding is commenced, does not usurp an exclusively judicial power, even though the prosecutor's decision effectively can preclude the court

[1]Further undesignated statutory references are to the Welfare and Institutions Code.

[2]Petitioners are Morgan Victor Manduley, Michael Anthony Rose, Jason Wayne Beever, Bradley Hunter Davidofsky, Steven James DeBoer, Nicholas Paul Fileccia, Adam Mitchell Ketsdever, and Kevin Scott Williams.

from selecting a particular sentencing alternative. Accordingly, we disagree with the Court of Appeal's conclusion that section 707(d) is unconstitutional under the separation of powers doctrine.

Because the Court of Appeal held that the statute violates the separation of powers doctrine, the appellate court did not resolve the other constitutional challenges to section 707(d) raised by petitioners in that court. In order to prevent continued uncertainty regarding the status of numerous proceedings involving accusations of criminal conduct committed by minors, we shall resolve those remaining issues in the present case. As discussed below, we have reached the following conclusions with regard to these questions: (1) the absence of a provision requiring that a judicial fitness hearing take place before a minor can be charged in criminal court pursuant to section 707(d) does not deprive petitioners of due process of law; (2) prosecutorial discretion to file charges against some minors in criminal court does not violate the equal protection clause; and (3) Proposition 21 does not violate the single-subject rule, set forth in article II, section 8, subdivision (d), of the California Constitution, applicable to initiative measures.

I

By a single felony complaint filed in the superior court, the People charged petitioners with eight felonies: four counts of assault with a deadly weapon by means of force likely to produce great bodily injury against four victims (Pen. Code, § 245, subd. (a)(1)), two counts of willful infliction of injury upon an elder under circumstances likely to result in great bodily harm or death (*id.*, § 368, subd. (b)(1)), and two counts of robbery (*id.*, § 211). The complaint alleged that these crimes were committed because of the victims' race, color, religion, nationality, country of origin, ancestry, gender, disability, or sexual orientation, and while petitioners acted in concert (*id.*, § 422.75, subd. (c)), and that some of the petitioners personally inflicted great bodily injury upon the victims (*id.*, § 12022.7, subd. (a)). Finally, the complaint alleged that four petitioners were 16 years of age or older at the time they committed the offenses, and that the remaining four petitioners were 14 years of age or older at the time they committed the offenses.

Petitioners demurred to the complaint, contending that section 707(d) is unconstitutional on a number of grounds. First, petitioners claimed that section 707(d) violates the separation of powers doctrine by vesting in the district attorney the discretion whether to file specified charges against minors 14 years of age and older in either the juvenile division or the criminal division of the superior court. Petitioners further contended that

section 707(d) deprives them of due process of law because the statute does not provide for any hearing to determine whether they are fit for a disposition under the juvenile court law. Petitioners also claimed that section 707(d) violates their right to uniform operation of the laws (Cal. Const., art. IV, § 16, subd. (a)) and equal protection of the laws, because it permits two classes of minors charged with the same crime to be treated differently at the discretion of the prosecutor. Furthermore, petitioners asserted that placing minors in prison with adult offenders violates the constitutional prohibitions against cruel and unusual punishment. Finally, petitioners contended that Proposition 21 violates the single-subject rule (Cal. Const., art. II, § 8, subd. (d)), because it addresses at least three assertedly distinct, unrelated subjects: (1) the juvenile justice system, (2) criminal gang activity, and (3) sentencing provisions unrelated to juveniles or gang activity.

The superior court overruled the demurrers. The court concluded that section 707(d) does not violate the separation of powers doctrine, because the decision whether to charge crimes lies within the traditional power and discretion of the prosecutor. The superior court also concluded that no due process right to a hearing exists in these circumstances, that the statute does not create any classes in which similarly situated individuals are treated disparately, that Proposition 21 does not violate the prohibitions against cruel and unusual punishment, and that the provisions of the initiative are reasonably related to, and germane to, the main purpose of reducing violent crimes committed by juveniles and gangs.

Petitioners Manduley and Rose filed separate petitions for writ of mandate and/or prohibition in the Court of Appeal. They sought an order dismissing the criminal complaint, directing the superior court to certify the matter to the juvenile division of the superior court for the filing of a petition pursuant to section 602, subdivision (a), and precluding their arraignment. The Court of Appeal granted the joint motions of all petitioners to join in both petitions, consolidated the petitions, stayed the arraignments of petitioners, and issued an order to show cause why the relief sought by petitioners should not be granted. Petitioners raised in the Court of Appeal all the issues raised in the superior court, except for the claim based upon the prohibitions against cruel and unusual punishment. In a divided decision, the Court of Appeal held that section 707(d) violates the separation of powers doctrine by conferring upon the prosecutor the discretion to determine which of two legislatively authorized sentencing schemes is available to the court. The majority briefly discussed and expressed doubt regarding the merits of petitioners' claims based upon the due process and equal protection clauses, but the Court of Appeal did not decide those issues.

The People sought review of the Court of Appeal's resolution of the separation of powers question. We granted review and specified that the

issues to be briefed and argued in this court shall include all issues raised in the Court of Appeal.

## II

We begin our analysis of petitioners' challenge to section 707(d) by reviewing relevant provisions of the juvenile court law and then describing the pertinent changes effected by Proposition 21.

The law apart from the provisions of Proposition 21 provides that except as otherwise specified by statute, any individual less than 18 years of age who violates the criminal law comes within the jurisdiction of the juvenile court,[3] which may adjudge such an individual a ward of the court. (§ 602, subd. (a).) A minor accused of a crime is subject to the juvenile court system, rather than the criminal court system, unless the minor is determined to be unfit for treatment under the juvenile court law or is accused of certain serious crimes. For example, when a petition is filed alleging that a minor 16 years of age or older has violated the criminal law and should be adjudged a ward of the juvenile court, the minor generally is subject to the juvenile court law unless the court concludes, upon the motion of the prosecutor and after an investigation and report by a probation officer, that the minor would not be amenable to the care, treatment, and training program available through the facilities of the juvenile court. (§ 707, subd. (a)(1).) In assessing the minor's fitness for treatment under the juvenile court law, the court considers the minor's degree of criminal sophistication, whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction, the minor's previous delinquent history, the success of previous attempts by the juvenile court to rehabilitate the minor, and the circumstances and gravity of the alleged offense. (*Ibid.*)

A minor 14 years of age or older who is alleged to have committed one of the serious crimes specified in section 707, subdivision (b)—such as murder, robbery, or assault with a firearm—is presumed not to be a fit and proper subject for treatment under the juvenile court law. (§ 707, subds. (b), (c).) At the juvenile court hearing to determine the question of fitness for treatment,

---

[3]The juvenile court and the criminal court are divisions of the superior court, which has subject matter jurisdiction over criminal matters and civil matters, including juvenile proceedings. (See Cal. Const., art. VI, § 10.) When exercising the jurisdiction conferred by the juvenile court law, the superior court is designated as the juvenile court. (Welf. & Inst. Code, § 245.) Accordingly, when we refer herein to the jurisdiction of the juvenile court or the jurisdiction of the criminal court, we do not refer to subject matter jurisdiction, but rather to the statutory authority of the particular division of the superior court, in a given case, to proceed under the juvenile court law or the law generally applicable in criminal actions. (See *In re Harris* (1993) 5 Cal.4th 813, 837 [21 Cal.Rptr.2d 373, 855 P.2d 391].)

a minor accused of such a crime has the burden of rebutting this presumption of unfitness by a preponderance of the evidence. (Cal. Rules of Court, rule 1483(a).) If a minor is declared not to be a fit and proper subject for treatment under the juvenile court law in accordance with the foregoing statutes, the district attorney may file an accusatory pleading against the minor in a court of criminal jurisdiction, and the case then proceeds according to the laws applicable to a criminal proceeding. (§ 707.1, subd. (a).)

Before the passage of Proposition 21, certain minors who were 16 years of age or older at the time they committed specified crimes were required to be prosecuted in a court of criminal jurisdiction—without any requirement of a determination by the juvenile court that the minor was unfit for treatment under the juvenile court law. Section 602, former subdivision (b), provided that an individual at least 16 years of age, who previously had been declared a ward of the court for having committed a felony after the age of 14 years, "shall be prosecuted in a court of criminal jurisdiction if he or she is alleged to have committed" any of several enumerated serious offenses, such as first degree murder where the minor personally killed the victim, certain violent sex offenses, and aggravated forms of kidnapping. (Stats. 1999, ch. 996, § 12.2.) When such a prosecution lawfully was initiated in a court of criminal jurisdiction, the individual would be subject to the same sentence as an adult convicted of the identical offense, subject to specified exceptions. (Pen. Code, § 1170.17, subd. (a).)

Former section 1732.6 of the Welfare and Institutions Code provided that in a criminal proceeding against a minor, the court retained discretion to sentence the minor to the California Youth Authority (Youth Authority), unless the minor (1) was convicted of a violent or serious felony, as defined by statute (Pen. Code, §§ 667.5, subd. (c), 1192.7, subd. (c)), and (2) received a sentence of life imprisonment, an indeterminate period up to life imprisonment, or a determinate period of years such that the maximum number of years of potential confinement could require incarceration of the minor beyond the age of 25 years. (Stats. 1994, 1st Ex. Sess. 1993-1994, ch. 15, § 1, p. 8575.) In addition, under no circumstances could a minor less than 16 years of age be housed in any facility under the jurisdiction of the Department of Corrections. (*Ibid.*)

Proposition 21 revised the juvenile court law to broaden the circumstances in which minors 14 years of age and older can be prosecuted in the criminal division of the superior court, rather than in juvenile court. Section 707(d), as amended by the initiative, authorizes specified charges against certain minors to be filed directly in a court of criminal jurisdiction, without a judicial determination of unfitness under the juvenile court law. The statute

sets forth three situations in which the prosecutor may choose to file an accusatory pleading against a minor in either juvenile court or criminal court: (1) a minor 16 years of age or older is accused of committing one of the violent or serious offenses enumerated in section 707, subdivision (b) (§ 707(d)(1)); (2) a minor 14 years of age or older is accused of committing certain serious offenses under specified circumstances (§ 707(d)(2)); and (3) a minor 16 years of age or older is accused of committing specified offenses, and the minor previously has been adjudged a ward of the court because of the commission of any felony offense when he or she was 14 years of age or older (§ 707(d)(3)).

Where the prosecutor files an accusatory pleading directly in a court of criminal jurisdiction pursuant to section 707(d), at the preliminary hearing the magistrate must determine whether "reasonable cause exists to believe that the minor comes within the provisions of" the statute (§ 707(d)(4))— e.g., reasonable cause to believe that a minor at least 16 years of age has committed an offense enumerated in section 707, subdivision (b), or that a minor at least 14 years of age has committed such an offense under the circumstances set forth in section 707(d)(2)(C). If such reasonable cause is not established, the case must be transferred to the juvenile court. (§ 707(d)(4).)

Section 602, subdivision (b), which specifies circumstances in which a minor must be prosecuted in a court of criminal jurisdiction, also was amended by Proposition 21. The revised statute decreases the juvenile's minimum age for such mandatory criminal prosecutions from 16 years to 14 years and alters in some respects the list of crimes for which a criminal prosecution is required.

In addition, Proposition 21 amended section 1732.6 to broaden the circumstances in which a minor shall not be committed to the Youth Authority. For example, a commitment to the Youth Authority is prohibited where a minor in a criminal action is convicted of an offense described in section 707(d)(1), (2), or (3) and the additional circumstances enumerated in those subdivisions are found true by the trier of fact. (§ 1732.6, subd. (b)(2).) As was provided prior to the passage of Proposition 21, however, minors less than 16 years of age shall not be housed in any facility under the jurisdiction of the Department of Corrections. (§ 1732.6, subd. (c).)

Among the changes effected by Proposition 21, petitioners challenge only the aspect of section 707(d) that confers upon the prosecutor the discretion to file certain charges against specified minors directly in criminal court, without any judicial determination that the minor is unfit for a juvenile court

disposition. We proceed to consider petitioners' various constitutional claims that section 707(d) is invalid.

## III

 Petitioners first contend that section 707(d) violates the separation of powers doctrine by vesting in the prosecutor the authority to make a decision—whether to initiate a proceeding in criminal court or juvenile court—that ultimately dictates whether minors charged with certain offenses, upon conviction, shall be sentenced under the criminal law or receive a disposition under the juvenile court law. The exercise of such authority by the executive branch, petitioners contend, invades the exclusive power of the judiciary to determine the appropriate sentence for individuals who commit criminal offenses. Petitioners' contention is based upon article III, section 3, of the California Constitution, which states: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."

The majority of the Court of Appeal agreed with petitioners that section 707(d) violates the separation of powers doctrine. The majority reasoned that resolution of this question depends upon whether the district attorney's choice between filing a petition in juvenile court or an accusatory pleading in criminal court is a charging decision properly allocated to the executive branch, or instead is a sentencing decision properly allocated to the judicial branch. According to the majority, "the fundamental nature of the decision given to district attorneys under section 707(d) is a decision that the adult sentencing scheme rather than the juvenile court dispositional scheme must be imposed if the juvenile is found guilty of the charged offenses." Section 707(d), the majority held, confers upon the prosecutor "the power to preemptively veto a court's sentencing discretion" and therefore violates separation of powers principles.

The dissent in the Court of Appeal, on the other hand, stated that prosecutors traditionally have possessed great discretion, largely unsupervised by the judiciary, to determine what charges to file against an individual, or whether to file charges at all. The dissent observed that a prosecutor's decision pursuant to section 707(d) whether to file charges in juvenile or criminal court is made before charges have been filed; therefore, the prosecutor exercises no veto over any judicial decision made after the proceeding is commenced. Because, in the dissent's view, the Legislature (or the voters through the initiative power) could abolish the juvenile justice system completely, or deny access to that system to juveniles of a certain age

charged with certain crimes, the dissent concluded that section 707(d) properly could "take a more moderate approach" and delegate to the executive branch the discretion to determine where to file—in juvenile court or criminal court—charges against juveniles of a certain age accused of particular crimes. In this court, the People adopt a position similar to that reflected in the dissent in the Court of Appeal.

We believe that the majority of the Court of Appeal adopted an unduly restrictive view of the scope of the executive power traditionally vested in prosecutors to decide what charges shall be alleged, and against whom charges shall be brought. This broad power to charge crimes extends to selecting the forum, among those designated by statute, in which charges shall be filed. Contrary to the majority of the Court of Appeal, the circumstance that such a charging decision may affect the sentencing alternatives available to the court does not establish that the court's power improperly has been usurped by the prosecutor.

■■■ " '[S]ubject to the constitutional prohibition against cruel and unusual punishment, the power to define crimes and fix penalties is vested exclusively in the legislative branch.' [Citations.]" (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 516 [53 Cal.Rptr.2d 789, 917 P.2d 628] (*Romero*).) "[T]he power of the people through the statutory initiative is coextensive with the power of the Legislature." (*Legislature v. Deukmejian* (1983) 34 Cal.3d 658, 675 [194 Cal.Rptr. 781, 669 P.2d 17].) "[T]he prosecuting authorities, exercising executive functions, ordinarily have the sole discretion to determine whom to charge with public offenses and what charges to bring. [Citations.] This prosecutorial discretion to choose, for each particular case, the actual charges from among those potentially available arises from ' "the complex considerations necessary for the effective and efficient administration of law enforcement." ' [Citations.] The prosecution's authority in this regard is founded, among other things, on the principle of separation of powers, and generally is not subject to supervision by the judicial branch. [Citations.]" (*People v. Birks* (1998) 19 Cal.4th 108, 134 [77 Cal.Rptr.2d 848, 960 P.2d 1073].) "When the decision to prosecute has been made, the process which leads to acquittal or to sentencing is fundamentally judicial in nature." (*People v. Tenorio* (1970) 3 Cal.3d 89, 94 [89 Cal.Rptr. 249, 473 P.2d 993].) The judicial power to choose a particular sentencing option, however, may be eliminated by the Legislature and the electorate. (*Romero, supra*, 13 Cal.4th at p. 516.)

■■■ Petitioners contend that the legislative branch unconstitutionally has conferred upon the executive branch (that is, the prosecutor) an exclusively judicial function of choosing the appropriate dispositions for certain

minors convicted of specified crimes. Several decisions of this court have addressed similar claims. As we shall explain, these decisions establish that the separation of powers doctrine prohibits the legislative branch from granting prosecutors the authority, *after* charges have been filed, to control the legislatively specified sentencing choices available to a court. A statute conferring upon prosecutors the discretion to make certain decisions *before* the filing of charges, on the other hand, is not invalid simply because the prosecutor's exercise of such charging discretion necessarily affects the dispositional options available to the court. Rather, such a result generally is merely incidental to the exercise of the executive function—the traditional power of the prosecutor to charge crimes. Because section 707(d) does not confer upon the prosecutor any authority to interfere with the court's choice of legislatively specified sentencing alternatives after an action has been commenced pursuant to that statute, we conclude that section 707(d) does not violate the separation of powers doctrine.

We reached a similar conclusion in *Davis v. Municipal Court* (1988) 46 Cal.3d 64 [249 Cal.Rptr. 300, 757 P.2d 11] (*Davis*). In that case, we considered a constitutional challenge to a local diversion program that conferred upon the district attorney the authority to decide, before charges were filed, whether a defendant would be eligible for pretrial diversion. Eligibility for the diversion program was limited to individuals charged with a misdemeanor offense. Thus, if an offense could be charged as either a misdemeanor or a felony, the prosecutor's decision to charge such a "wobbler" as a felony precluded diversion, even if the court subsequently exercised its discretion to reduce the felony charge to a misdemeanor. The defendant in *Davis* contended that conditioning eligibility for diversion upon the prosecutor's decision to charge a wobbler as a misdemeanor improperly infringed upon the judicial power to make the ultimate determination whether a particular defendant should be diverted. We rejected the contention that this aspect of the diversion program violated the separation of powers doctrine.

Our decision in *Davis* explained: "It is true, of course, that a prosecutor's exercise of discretion to charge a defendant with a felony rather than a misdemeanor when the facts of the case would support either charge will frequently have a variety of effects on the ultimate judicial disposition of the matter. A prosecutor's charging decision may, for example, determine whether a defendant is convicted of an offense for which probation may not be granted, or for which a specific punishment is mandated. Those familiar consequences of the charging decision have, however, never been viewed as converting a prosecutor's exercise of his traditional charging discretion into a violation of the separation-of-powers doctrine." (*Davis*, *supra*, 46 Cal.3d at p. 82.)

In *Davis, supra*, 46 Cal.3d at pages 81-86, we distinguished a line of decisions that invalidated statutory provisions purporting to give a prosecutor the right to veto decisions made by a court *after* criminal charges had been filed. (E.g., *People v. Superior Court (On Tai Ho)* (1974) 11 Cal.3d 59 [113 Cal.Rptr. 21, 520 P.2d 405] (*On Tai Ho*) [district attorney could not disapprove trial court's decision, following a hearing, to grant diversion]; *Esteybar v. Municipal Court* (1971) 5 Cal.3d 119 [95 Cal.Rptr. 524, 485 P.2d 1140] [district attorney could not veto magistrate's decision to reduce a wobbler to a misdemeanor]; *People v. Tenorio, supra*, 3 Cal.3d 89 [district attorney could not preclude trial court from exercising discretion to strike an allegation of a prior conviction for the purpose of sentencing].) Such decisions are based upon the principle that once the decision to prosecute has been made, the disposition of the matter is fundamentally judicial in nature. A judge wishing to exercise judicial power at the judicial stage of a proceeding never should be required to " 'bargain with the prosecutor' " before doing so. (*Davis, supra*, 46 Cal.3d at p. 83.) Charging decisions made before the jurisdiction of a court is invoked and before a judicial proceeding is initiated, on the other hand, involve purely prosecutorial functions and do not limit judicial power. (*Id.* at p. 86.) This court recently reiterated these principles when we construed a provision of the "Three Strikes" law (Pen. Code, § 667, subd. (f)) not to require the prosecutor's consent before a trial court could exercise its authority at sentencing to strike a prior-felony-conviction allegation pursuant to Penal Code section 1385. (*Romero, supra*, 13 Cal.4th at pp. 509-517.)

Like the decision whether to charge a wobbler as a misdemeanor, considered in *Davis, supra*, 46 Cal.3d 64, a prosecutor's decision pursuant to section 707(d) whether to file a wardship petition in juvenile court or an accusatory pleading in criminal court is made before the jurisdiction of the court is invoked. Although a decision to file charges directly in criminal court might preclude a juvenile court disposition, such a decision—like the prosecutor's decision in *Davis*—constitutes an aspect of traditional prosecutorial charging discretion and does not intrude upon the judicial function.

Petitioners concede that the legislative branch possesses the power to require that particular charges against certain minors always be initiated in criminal court (§ 602, subd. (b)), and to preclude juvenile dispositions for certain minors convicted of specified offenses (§ 1732.6). (See *In re Jose H.* (2000) 77 Cal.App.4th 1090, 1099-1100 [92 Cal.Rptr.2d 228].) Petitioners assert, however, that where the juvenile court law provides for the *possibility* of a juvenile court disposition for a particular minor, the decision whether the minor ultimately receives such a disposition is exclusively a judicial function and cannot be made by the prosecutor.

A consideration of the statutory changes effected by Proposition 21, however, establishes that the legislative branch has eliminated the judicial power upon which petitioners base their claim. It is true that, prior to the enactment of section 707(d), section 707 provided that the juvenile court, after a hearing, made the decision whether certain minors charged with particular offenses were fit for treatment under the juvenile court law or instead could be charged and sentenced in criminal court. (See *Edsel P. v. Superior Court* (1985) 165 Cal.App.3d 763, 786 [211 Cal.Rptr. 869] [fitness determination constitutes a judicial function].) Now, however, with regard to minors within the scope of section 707(d), the statute confers upon the *prosecutor* the discretion to determine whether accusations of criminal conduct against the minor should be filed in the juvenile court or criminal court. If the prosecutor initiates a proceeding in criminal court, and the circumstances specified in section 707(d) are found to be true, the court generally is precluded by statute from ordering a juvenile disposition. (Welf. & Inst. Code, § 1732.6, subd. (b)(2); see Pen. Code, §§ 1170.17, 1170.19.)

The prosecutor's discretionary charging decision pursuant to section 707(d), which thus can limit the dispositional alternatives available to the court, is no different from the numerous prefiling decisions made by prosecutors (e.g., whether to charge a wobbler as a felony, or whether to charge a particular defendant with assault, assault with a deadly weapon, or another form of aggravated assault, or whether to charge manslaughter or murder, or whether to allege facts that would preclude probation eligibility [Pen. Code, § 1203.06 et seq.]) that limit the dispositions available to the court after charges have been filed. Conferring such authority upon the prosecutor does not limit the judicial power, after charges have been filed, to choose among the dispositional alternatives specified by the legislative branch. The voters, through the enactment of Proposition 21, have determined that the judiciary shall not make the determination regarding a minor's fitness for a juvenile disposition where the prosecutor initiates a criminal action pursuant to section 707(d).[4]

Contrary to the majority of the Court of Appeal, the circumstance that a fitness determination for minors accused of crimes within the scope of section 707(d) *formerly* was made by the court after a judicial hearing does not establish that granting the prosecutor discretion whether to file charges directly in criminal court invades the judicial prerogative. The Court of

---

[4]The present case does not raise any issue regarding the superior court's authority to dismiss, in furtherance of justice, an action commenced in criminal court pursuant to section 707(d). (See Pen. Code, § 1385, subd. (a).) Nor are we confronted with any question regarding the scope or validity of Welfare and Institutions Code section 1732.6, which precludes commitment to the Youth Authority where a minor is convicted in a criminal action of specified offenses. (See also Pen. Code, § 1170.17.)

Appeal reasoned that, absent section 707(d), the determination of whether the juvenile or criminal sentencing scheme will apply "requires a particularized evidentiary hearing to adjudicate the individual juvenile's fitness or suitability for juvenile court treatment, and . . . these adjudicatory functions are essentially judicial in nature." Therefore, the court determined, the decision regarding which dispositional scheme applies "is adjudicatory in nature, and . . . section 707(d) allocates a judicial power and function to the district attorney in violation of separation of powers principles."

The Court of Appeal majority's analysis misapprehends the purpose and scope of the separation of powers doctrine. The charging authority implicated by section 707(d) constitutes an exclusive executive function, generally reviewable by the judicial branch only for certain constitutionally impermissible factors, such as discriminatory prosecution. (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 976 [60 Cal.Rptr.2d 93, 928 P.2d 1171].) " 'The action of a district attorney in filing an information is not in any way an exercise of a judicial power or function.' [Citation.]" (*Ibid.*) The circumstance that a charging decision pursuant to section 707(d) can affect judicial functions, after charges have been filed, does not result in a violation of the separation of powers doctrine.

The majority of the Court of Appeal also erred in equating the prosecutor's decision pursuant to section 707(d) with the fitness determination made by the juvenile court. In circumstances in which 707(d) applies, the statute dispenses with the requirement of "a particularized evidentiary hearing to adjudicate the individual juvenile's fitness or suitability for juvenile court treatment," which the Court of Appeal deemed to be an essential adjudicatory function that could not be delegated to the prosecutor. For example, where the prosecutor accuses a minor 16 years of age or older of committing an offense enumerated in section 707, subdivision (b), the prosecutor possesses discretion to file an accusatory pleading in criminal court. (§ 707(d)(1).) In making the decision whether to file a petition in juvenile court or a pleading in criminal court, the district attorney might consider circumstances ordinarily at issue in a fitness hearing (see § 707, subd. (a)(1)), but section 707(d) does not require the prosecutor to do so. In this situation, nothing in the juvenile court law requires or authorizes an evidentiary fitness hearing or any other judicial determination of fitness—other than a finding at the preliminary hearing that reasonable cause exists to believe that the minor has committed an offense described in section 707(d) under the circumstances set forth therein. Thus, section 707(d) grants the district attorney authority to establish and apply the criteria that guide his or her decision whether to file an accusatory pleading in criminal court. Such power is well within the district attorney's traditional executive authority. (*Davis, supra,* 46 Cal.3d at pp. 77-78.)

■ Furthermore, the primary purpose of the separation of powers doctrine "is to prevent the combination in the hands of a single person or group of the basic or fundamental powers of government." (*Parker v. Riley* (1941) 18 Cal.2d 83, 89 [113 P.2d 873, 134 A.L.R. 1405].) "The doctrine has not been interpreted as requiring the rigid classification of all the incidental activities of government, with the result that once a technique or method of procedure is associated with a particular branch of the government, it can never be used thereafter by another." (*Id.* at p. 90) The separation of powers doctrine "recognizes that the three branches of government are interdependent, and it permits actions of one branch that may 'significantly affect those of another branch.' [Citation.]" (*Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 298 [105 Cal.Rptr.2d 636, 20 P.3d 533].) The doctrine " 'is not intended to prohibit one branch from taking action properly within its sphere that has the *incidental* effect of duplicating a function or procedure delegated to another branch.' [Citation.]" (*Ibid.*)

■ The decision whether a minor is to be tried in the juvenile or the criminal division of the superior court, even before the passage of Proposition 21, has not been considered to constitute an exclusively judicial function. For example, if a prosecutor decides to charge a minor at least 14 years of age with certain serious crimes, such as murder with special circumstances when the minor personally killed the victim, the minor *must* be prosecuted in a court of criminal jurisdiction. (§ 602, subd. (b).) If, on the other hand, the prosecutor chooses to charge the same minor with voluntary manslaughter, the juvenile court, upon the motion of the prosecutor, must conduct a fitness hearing to determine whether the minor should be the subject of a juvenile court proceeding or be tried in criminal court. (§ 707, subd. (c).) In this situation, the Legislature's specification of crimes in section 602, together with the prosecutor's exercise of discretion whether to charge a crime specified in that statute, dictates whether the juvenile court will be afforded an opportunity to determine whether the minor is fit for a juvenile court disposition.

Similarly, the prosecutor's decision whether to file certain charges directly in criminal court pursuant to section 707(d), when the circumstances enumerated in that provision are present, might control whether a juvenile disposition will be available to the court in such a proceeding. The prosecutor does not usurp any fundamental judicial power in exercising such discretion, even though the court in other situations is authorized to decide whether a minor is fit for a disposition in juvenile court. The circumstance that a fitness determination is one that properly could be made by the judicial branch, or that historically has been made by the judicial branch, does not alone invalidate a statute granting the executive branch the authority to make an analogous determination that has the same effect as a decision

regarding fitness. (See *Carmel Valley Fire Protection Dist. v. State of California, supra,* 25 Cal.4th 287, 300-301 [separation of powers doctrine does not preclude the Legislature from exercising authority over a matter that could have been undertaken by the executive branch]; *In re Attorney Discipline System* (1998) 19 Cal.4th 582, 596, 602 [79 Cal.Rptr.2d 836, 967 P.2d 49] [separation of powers doctrine does not bar the judicial branch from undertaking a function historically performed by the Legislature].)

Petitioners acknowledge that determining an individual's *eligibility* for a particular sentencing alternative is not exclusively a judicial power, and that this power properly may be exercised by the prosecutor or the Legislature. They contend, however, that a prosecutor's decision whether a particular minor is to be charged in criminal court instead determines *suitability* for a sentencing alternative, and that such a determination is solely a judicial power. Petitioners rely upon *On Tai Ho, supra,* 11 Cal.3d 59, and *Sledge v. Superior Court* (1974) 11 Cal.3d 70 [113 Cal.Rptr. 28, 520 P.2d 412] (*Sledge*), companion cases in which this court considered a pretrial diversion program for defendants charged with certain narcotics offenses. Under the statutory scheme at issue in those cases, the prosecutor conducted a preliminary screening to determine whether a defendant met certain minimum standards of eligibility specified by statute. If it appeared that the defendant was eligible for diversion, the court conducted a hearing and decided whether to divert the defendant into a rehabilitation program. (*On Tai Ho, supra,* 11 Cal.3d at pp. 62-63.)

In *On Tai Ho, supra,* 11 Cal.3d 59, we held that a statutory provision purporting to subject the court's diversion decision to a prosecutorial veto violated the separation of powers doctrine, because the decision whether to divert was an exercise of judicial power. Our opinion emphasized that this decision was made after the jurisdiction of the court had been invoked, that the diversion hearing mandated by statute was a judicial proceeding, and that the statute vested in the court the power to weigh the evidence and make a determination as to the appropriate disposition.

In *Sledge, supra,* 11 Cal.3d 70, we held that the district attorney's preliminary determination of eligibility for the program was not a judicial act and therefore did not violate the separation of powers doctrine. Our decision relied upon the circumstances that the information required to determine eligibility was in the possession of the district attorney rather than the court, that the statute specified which facts were material and relevant to eligibility and did not confer upon the prosecutor any power to weigh the effect of those facts, and that the prosecutor's determination that there was evidence rendering a defendant ineligible for diversion could be reviewed on appeal from any conviction.

Petitioners contend that the district attorney's decision pursuant to section 707(d) to prosecute a minor in criminal court is more akin to an unconstitutional prosecutorial veto of a judicial sentencing decision, as in *On Tai Ho, supra,* 11 Cal.3d 59, than to the eligibility determination upheld in *Sledge, supra,* 11 Cal.3d 70. They distinguish, on the following grounds, a decision made pursuant to section 707(d) from the eligibility decision in *Sledge*: (1) section 707(d) does not specify any eligibility criteria; (2) information regarding amenability to a juvenile court disposition is uniquely within the possession of the minor rather than the prosecutor; (3) no judicial hearing is available to evaluate the minor's suitability for a juvenile court disposition; and (4) no record is created to protect the right to judicial review.

Any distinctions between the prosecutor's authority at issue in *Sledge, supra,* 11 Cal.3d 70, and that in the present case, however, do not establish that the prosecutor's exercise of discretion pursuant to section 707(d) usurps an exclusively judicial power. First, as in *Davis, supra,* 46 Cal.3d at pages 77-78, the legislative branch properly has conferred upon the prosecutor the authority to establish the criteria guiding his or her decision whether to file an action in criminal court pursuant to section 707(d), rather than specifying such criteria by statute as in *Sledge*. Second, contrary to petitioners' assertion, information relevant to the prosecutor's decision, such as the minor's prior criminal history and evidence of the minor's current criminal conduct, is within the possession of the prosecutor. Third, no judicial hearing is available regarding amenability for a particular disposition because, unlike the statute considered in *Sledge*, section 707(d) does not provide for such a hearing or a judicial determination of fitness. Therefore, even if a prosecutor weighs the effect of relevant evidence in reaching a decision, he or she does not interfere with the authority of the court. Finally, section 707(d) does provide for a judicial determination, after the charging decision is made, to ensure that the minor meets the statutory criteria set forth in section 707(d). There is no judicial "review" of the prosecutor's exercise of discretion to file charges in criminal court against minors who come within the scope of section 707(d), because just as with other instances of the traditional charging power of the prosecutor, the statute vests in the prosecutor the power both to establish and to apply the criteria guiding that decision. For these reasons, a prosecutor's decision to file charges against a minor in criminal court pursuant to section 707(d) is not analogous to a prosecutor's veto of a court's legislatively authorized determination, after a judicial hearing, of a defendant's suitability for a particular disposition, and such a decision does not usurp a power possessed solely by the judicial branch.

Petitioners further characterize the prosecutor's decision pursuant to section 707(d) as the selection of the "jurisdiction with the most 'appropriate'

sentencing scheme" for a particular defendant, and they attempt to contrast such a decision with a prosecutor's well-established authority to select which crime to charge. As established above, however, the decision to charge a minor with a particular crime, like a decision pursuant to section 707(d) to file charges in criminal court, also can eliminate the juvenile court's jurisdiction over the matter and dictate the sentencing scheme that will apply upon conviction, and petitioners admit that the former decision properly can be exercised by the prosecutor. Inasmuch as petitioners concede that the Legislature possesses the authority to eliminate entirely the jurisdiction of the juvenile court and preclude juvenile court dispositions with regard to *all* minors who come within the scope of section 707(d), a statute conferring upon the prosecutor the discretion, before a judicial proceeding has been commenced, to charge *some* of these minors in criminal court does not usurp an exclusively judicial authority.

Moreover, the Legislature in other contexts has authorized the People to pursue allegations of criminal conduct in alternative fora, sometimes with different penalties. For example, before unification of the California trial courts, the prosecutor's decision whether to charge an offense as a misdemeanor or a felony could determine whether the matter would be tried in municipal court or superior court. (See Pen. Code, § 1462, subd. (a) [municipal court had jurisdiction in cases involving misdemeanors].) ▇ In addition, where criminal conduct constitutes a violation of both federal law and state law, and federal and California courts have concurrent jurisdiction, the district attorney possesses discretion to consent to proceedings in federal court or to request that the federal authorities relinquish a federal prisoner to the state for prosecution. (4 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Jurisdiction and Venue, § 5, p. 91.) Furthermore, where the Legislature has specified more than one location in which venue is proper, prosecutors may choose the forum in which to file criminal charges. (See Pen. Code, §§ 778-795.) Finally, the Legislature has conferred upon district attorneys the discretion to seek either civil or criminal sanctions for certain illegal conduct. For example, when confronted with gang-related crime, the prosecutor can decide to charge individual gang members in criminal court for the offense of participation in a criminal street gang (Pen. Code, § 186.22) or instead can file a civil action in superior court to abate gang activity (*id.*, § 186.22a). (See also, e.g., Bus. & Prof. Code, § 16754 [authorizing district attorney to initiate civil actions or criminal proceedings for violations of the Cartwright Act]; Health & Saf. Code, §§ 25189-25191 [authorizing both criminal and civil penalties for the illegal disposal of hazardous waste].) ▇ Therefore, the circumstance that a prosecutor's charging decision pursuant to section 707(d) determines the forum in which charges of criminal conduct against minors are adjudicated, or limits the sanctions available

to the court, does not mean that the prosecutor exercises any judicial power when making such a decision.

We also find no merit in petitioners' contention that the absence of statutory criteria guiding the prosecutor's decision pursuant to section 707(d) results in an unconstitutional delegation of the Legislature's exclusive authority to fix penalties for crimes. As we have explained, most prosecutorial charging decisions can circumscribe the sentencing options available to the court, and such decisions never have been considered to be analogous to fixing penalties for charged crimes or to require legislative guidelines governing the exercise of prosecutorial discretion. The minimum standards governing the prosecutor's discretion whether to file charges against a minor in criminal court are those set forth in section 707(d). In these circumstances, a prosecutor's charging decision that results in a greater or lesser penalty does not constitute an impermissible delegation of legislative authority. (*Davis, supra,* 46 Cal.3d at pp. 88-89.) Similarly, we have rejected the claim that, in capital cases, the prosecutor is required to abide by certain nonarbitrary standards in making the initial decision whether to allege special circumstances and whether to seek the death penalty. (*People v. Lucas* (1995) 12 Cal.4th 415, 478 [48 Cal.Rptr.2d 525, 907 P.2d 373].) "When he [or she] acts under such a law, and '[a]bsent a persuasive showing to the contrary, we must presume that the district attorney's decisions were legitimately founded on the complex considerations necessary for the effective and efficient administration of law enforcement. [Citation.]' [Citation.]" (*People v. Keenan* (1988) 46 Cal.3d 478, 506 [250 Cal.Rptr. 550, 758 P.2d 1081].) These principles apply with equal force to a prosecutor's decision whether to file a criminal action pursuant to section 707(d). The statute does not result in an improper delegation of legislative power.

Courts in several other jurisdictions have rejected similar challenges, based upon the separation of powers doctrine, to statutes conferring upon prosecutors the authority to decide whether to file charges against minors in criminal court rather than juvenile court. (E.g., *People v. Thorpe* (Colo. 1982) 641 P.2d 935, 938-940; *State v. Cain* (Fla. 1980) 381 So.2d 1361, 1367-1368; *Bishop v. State* (1995) 265 Ga. 821 [462 S.E.2d 716, 717]; *People v. Conat* (1999) 238 Mich.App. 134 [605 N.W.2d 49, 56-59]; *Jones v. State* (1982) 1982 Okla. 196 [654 P.2d 1080, 1082-1083]; *Hansen v. State* (Wyo. 1995) 904 P.2d 811, 819-820.) The Court of Appeal distinguished some of these decisions on the ground that the statutory schemes there at issue authorized the criminal court to remand the case to the juvenile system after the action had been commenced, thus preserving the authority of the judiciary. For the most part, however, this circumstance was not important to the analysis of these decisions, which in upholding the statutes relied

primarily upon the scope of the prosecutor's discretionary charging power. Furthermore, the statutory scheme considered in *People v. Conat, supra,* 605 N.W.2d 49, did not include a provision for the court to remand the proceeding to the juvenile court. These decisions provide additional support for our conclusion that the prosecutor's exercise of discretion pursuant to section 707(d) whether to file an accusatory pleading in criminal court is within the scope of the executive power and does not violate the separation of powers doctrine.

Having concluded that the Court of Appeal erred in holding section 707(d) unconstitutional under the separation of powers doctrine, we shall resolve petitioners' remaining constitutional challenges to the statute.

IV

■ Petitioners further challenge section 707(d) on the ground that it deprives them of due process of law as guaranteed by the federal and California Constitutions. (U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, § 7, subd. (a).) According to petitioners, a minor accused of criminal conduct possesses a statutory right to be subject to the jurisdiction of the juvenile court. Before a prosecutor may deprive a minor of that right by filing an action in criminal court pursuant to section 707(d), petitioners contend, the minor is entitled to a hearing to determine, pursuant to established criteria, whether he or she is amenable for a juvenile court disposition. Because section 707(d) neither provides for such a hearing nor sets forth criteria guiding the prosecutor's exercise of discretion, petitioners claim that the statute violates minimum constitutional standards of procedural fairness.

The premise of petitioners' claim is false, however, because minors who commit crimes under the circumstances set forth in section 707(d) do not possess any statutory right to be subject to the jurisdiction of the juvenile court. Although the juvenile court has jurisdiction over minors accused of most crimes (§ 602), under the statutory provisions adopted by the enactment of Proposition 21, the criminal court also has jurisdiction over those minors who come within the scope of section 707(d), when the prosecutor files charges in that court. (§ 707(d)(4).) In these circumstances, when governing statutes provide that the juvenile court and the criminal court have concurrent jurisdiction, minors who come within the scope of section 707(d) do not possess any right to be placed under the jurisdiction of the juvenile court before the prosecutor initiates a proceeding accusing them of a crime. Thus, the asserted interest that petitioners seek to protect through a judicial hearing does not exist.

Statutory provisions that predate the adoption of Proposition 21 cannot properly be interpreted to afford minors a statutory right that is inconsistent

with the language and purpose of this legislative measure. Proposition 21 neglected to amend explicitly the jurisdictional provisions of section 603[5] to clarify that a criminal charge against a minor may be filed directly in a court of criminal jurisdiction pursuant to *either* the preexisting provisions of section 707.01 (as already provided in section 603, subdivision (b)) *or* the newly adopted provisions of section 707(d). In light of established principles of statutory construction, however, it is clear that because the provisions of section 707(d) are more recently enacted and more specific than the provisions of section 603, it is appropriate to harmonize the two statutes to effectuate the purpose of this aspect of Proposition 21. (See *Lake v. Reed* (1997) 16 Cal.4th 448, 464 [65 Cal.Rptr.2d 860, 940 P.2d 311]; *DeVita v. County of Napa* (1995) 9 Cal.4th 763, 778 [38 Cal.Rptr.2d 699, 889 P.2d 1019]; *Kaiser v. Hopkins* (1936) 6 Cal.2d 537, 538 [58 P.2d 1278].) Accordingly, section 707(d) properly must be interpreted as creating an additional statutory exception to the general rule, reflected in section 603, subdivision (a), that criminal charges against minors ordinarily must be filed initially in juvenile court.

For similar reasons, an isolated phrase contained in section 707(d)(6) cannot be interpreted reasonably to create a right or expectation that a minor may be tried in criminal court only after a determination of unfitness equivalent to that made by the juvenile court pursuant to other subdivisions of section 707. Section 707(d)(6) states: "If, pursuant to this subdivision, the minor is found to be not a fit and proper subject for juvenile court treatment and is tried in a court of criminal jurisdiction and found guilty by the trier of fact, the judge may commit the minor to the Youth Authority in lieu of sentencing the minor to the state prison," except as otherwise provided by statute. Language identical to that in section 707(d)(6) also was added by Proposition 21 to section 707, subdivisions (a) and (c), which require the juvenile court to make a fitness determination based upon an evaluation of specified criteria concerning the minor. Read in context, the obvious purpose of this language is to make clear that minors whose cases are tried in criminal court under *any* provision of section 707, *including section 707(d)*, may be committed to the Youth Authority instead of state prison (subject to the exceptions specified in section 1732.6). In view of the explicit language

---

[5]Section 603 provides in full: "(a) No court shall have jurisdiction to conduct a preliminary examination or to try the case of any person upon an accusatory pleading charging that person with the commission of a public offense or crime when the person was under the age of 18 years at the time of the alleged commission thereof unless the matter has first been submitted to the juvenile court by petition as provided in Article 7 (commencing with Section 650), and the juvenile court has made an order directing that the person be prosecuted under the general law.

"(b) This section shall not apply in any case involving a minor against whom a complaint may be filed directly in a court of criminal jurisdiction pursuant to Section 707.01."

of subdivision (d)(1), (2), and (3) of section 707, which authorizes prosecutors to file actions in criminal court without any reference to a fitness determination, and the purpose of these provisions as reflected in the ballot materials,[6] section 707(d) as a whole cannot be construed reasonably as placing a substantive "unfitness" limitation upon the prosecutor's discretion and thereby creating a liberty interest in a minor not to be charged in criminal court without such a finding.

Several amici curiae supporting petitioners[7] contend that juvenile offenders possess a constitutionally protected liberty interest in remaining in the juvenile court system, and that this interest precludes the prosecutor from filing charges against minors in criminal court without first providing notice and a hearing. The authority upon which amici curiae rely, however, found liberty interests arising from statutes that created an expectation that adverse action by the state would occur only upon the occurrence of certain conditions. (E.g., *Vitek v. Jones* (1980) 445 U.S. 480, 488-491 [100 S.Ct. 1254, 1261-1263, 63 L.Ed.2d 552] [transfer of prisoner to mental hospital permitted only after a finding of mental illness].) Section 707(d), in contrast, eliminates any expectation that a minor who commits an offense under the circumstances specified therein will be transferred to criminal court only upon an adverse fitness determination by the court. The predicate for filing charges in criminal court pursuant to section 707(d) is a determination by the prosecutor that the circumstances set forth in that statute are present. To the extent this provision creates a protected liberty interest that minors will be subject to the jurisdiction of the criminal court only upon the occurrence of the conditions set forth therein, the statute *does* require a judicial determination, at the preliminary hearing, "that reasonable cause exists to believe that the minor comes within the provisions" of the statute. (§ 707(d)(4).) Contrary to the contention of amici curiae, such a minor possesses no other protected interest in remaining in the juvenile court system. (*Hicks v. Superior Court* (1995) 36 Cal.App.4th 1649, 1658 [43 Cal.Rptr.2d 269] [minors possess no constitutional or fundamental right to trial in juvenile court];

---

[6] The analysis of the initiative by the Legislative Analyst states that "prosecutors would be allowed to directly file charges against juvenile offenders in adult court under a variety of circumstances without first obtaining permission of the juvenile court." (Ballot Pamp., Primary Elec. (Mar. 7, 2000) analysis of Prop. 21 by Legis. Analyst, p. 45.) The rebuttal to the argument in favor of Proposition 21 quotes the following statement of a judge of the juvenile court: " 'Proposition 21 would let prosecutors move kids like mentally impaired children to adult court where they don't belong, *without judicial review*. These important decisions must be reviewed by an impartial judge.' " (*Id.*, rebuttal to argument in favor of Prop. 21, p. 48.)

[7] Public Counsel; Bar Associations of Los Angeles County, Beverly Hills, Culver Marina, and San Francisco; Women Lawyers Association of Los Angeles; Criminal Courts Bar Association; Mexican American Bar Association; and Los Angeles Chapter of the National Association of Counsel for Children.

accord, *State v. Angel C.* (1998) 245 Conn. 93 [715 A.2d 652, 659-665] [minors possess no liberty interest in juvenile status where applicable statutes authorize prosecutor to file charges directly in criminal court or to seek a transfer to juvenile court].)

Because petitioners do not possess a protected interest in being subject to the jurisdiction of the juvenile court, the authority upon which they rely in support of their claim is distinguishable. In *Kent v. United States* (1966) 383 U.S. 541 [86 S.Ct. 1045, 16 L.Ed.2d 84] (*Kent*), the high court considered a statutory scheme conferring upon the juvenile court " 'original and exclusive' " jurisdiction over a minor accused of committing various crimes. (*Id.* at p. 556 [86 S.Ct. at p. 1055].) The law authorized the juvenile court to waive its jurisdiction and transfer the matter to criminal court after a " 'full investigation,' " but no statutory criteria or procedures governed the juvenile court's determination to waive jurisdiction. (*Id.* at p. 547 [86 S.Ct. at p. 1050].) The decision in *Kent* held that the juvenile court violated the minor's right to due process of law when it transferred the matter to criminal court without conducting a hearing or providing a statement of reasons. The United States Supreme Court explained that the waiver of jurisdiction in this context was a critically important action that determined vitally important statutory rights of the minor, including whether he was entitled to the special rights and immunities ordinarily conferred upon minors under the juvenile court law. Under these circumstances, the high court held, the minor was entitled to a judicial hearing affording "the essentials of due process and fair treatment." (*Id.* at p. 562 [86 S.Ct. at p. 1057].) In connection with such a hearing, the minor possessed the right to the effective assistance of counsel, access to the records considered by the juvenile court, and a statement of reasons for the juvenile court's decision. (*Id.* at pp. 553-563 [86 S.Ct. at pp. 1053-1058]; see also *In re Winnetka V.* (1980) 28 Cal.3d 587, 593-595 [169 Cal.Rptr. 713, 620 P.2d 163] [requiring procedural protections in connection with juvenile fitness determinations and dispositional orders made by the court].)

Unlike the statute considered in *Kent, supra,* 383 U.S. 541, California's juvenile court law does not confer upon the juvenile court original and exclusive jurisdiction over minors accused of crimes under the circumstances set forth in section 707(d). Furthermore, pursuant to section 707(d), neither the juvenile court nor the criminal court renders a decision whether the minor is fit for a juvenile court disposition. Rather, as we have explained, the prosecutor's charging decision determines which court shall hear the matter. Petitioners nevertheless contend that the procedural protections ordinarily applicable in judicial fitness hearings, and mandated for such hearings by *Kent,* also must apply to the prosecutor's exercise of discretion

whether to file charges in juvenile court or criminal court. Otherwise, they maintain, decisions determining whether minors are amenable to juvenile court treatment will be arbitrary and subject to the whim of individual prosecutors.

As the Court of Appeal in the present case recognized, however, *Kent, supra*, 383 U.S. 541, held only that where a statute confers a right to a *judicial* determination of fitness for a juvenile court disposition, the due process clause requires that the determination be made in compliance with the basic procedural protections afforded to similar judicial determinations. A statute that authorizes discretionary direct filing in criminal court by the prosecutor, on the other hand, does not require similar procedural protections, because it does not involve a judicial determination but rather constitutes an executive charging function, which does not implicate the right to procedural due process and a hearing.

Numerous decisions from other jurisdictions support the conclusion that a prosecutor's discretionary decision to file charges against a minor in criminal court does not give rise to procedural protections ordinarily afforded in connection with a judicial decision. For example, in *Woodard v. Wainwright* (5th Cir. 1977) 556 F.2d 781, 784-787, the federal court of appeals considered a statute that precluded juvenile court jurisdiction over certain minors indicted for serious crimes. Noting the long tradition of prosecutorial discretion in charging crimes, the court held that the prosecutor's discretionary decision whether to present the case against the minor to a grand jury, and thus divest the juvenile court of jurisdiction upon indictment, did not trigger any due process right to a hearing. The decision in *Woodard* agreed with the statement in *Russell v. Parratt* (8th Cir. 1976) 543 F.2d 1214, 1216, that prosecutorial decisions whether to charge minors as adults or juveniles fall within " 'the long and widely accepted concept of prosecutorial discretion, which derives from the constitutional principle of separation of powers.' " The court of appeals also relied upon *Cox v. United States* (4th Cir. 1973) 473 F.2d 334, 335, which determined that the decision by a United States attorney to charge a juvenile as an adult was "a prosecutorial decision beyond the reach of the due process rights of counsel and a hearing," and upon *United States v. Bland* (D.C. Cir. 1972) 472 F.2d 1329, 1337, in which the court stated: "We cannot accept the hitherto unaccepted argument that due process requires an adversary hearing before the prosecutor can exercise his age-old function of deciding what charge to bring against whom. Grave consequences have always flowed from this, but never has a hearing been required."

Relying in part upon the foregoing decisions, the Connecticut Supreme Court recently reached the same conclusion in upholding a statute requiring

that minors at least 14 years of age charged with certain crimes be tried in criminal court, unless the prosecutor exercised discretion to recommend that the court transfer the case to the juvenile docket. In *State v. Angel C., supra,* 715 A.2d at page 666, the court explained: "There is a vast difference between the exercise of judicial discretion without a hearing and the exercise of executive, i.e., prosecutorial, discretion without a hearing. The former has been held to violate due process, while the latter has not. 'Judicial proceedings must be clothed in the raiment of due process, while the processes of prosecutorial decision-making wear very different garb. It is one thing to hold, as we have, that when a state makes waiver of a juvenile court's jurisdiction a judicial function, the judge must cast about the defendant all of the trappings of due process, but it does not necessarily follow that a state or the United States may not constitutionally treat the basic question as a prosecutorial function . . . . [T]he character of the proceeding, rather than its consequences to the accused, are largely determinative of his rights. . . . [T]he guaranty of a hearing found in the due process clause of the Fifth [and Fourteenth] Amendment[s] has traditionally been limited to judicial and quasi-judicial proceedings. It has never been held applicable to the processes of prosecutorial decision-making.' [Citation.] Consequently, the prosecutor's right to exercise discretion in determining whether to recommend transfer to the juvenile docket does not violate the defendants' due process rights."

In sum, under the circumstances of the present case, petitioners do not possess any right to be subject to the jurisdiction of the juvenile court. As we have concluded, the legislative branch properly can delegate to the prosecutor—who traditionally has been entrusted with the charging decision—discretion whether to file charges against a minor directly in criminal court, and the Legislature also can eliminate a minor's statutory right to a judicial fitness hearing. Therefore, a prosecutor's decision pursuant to section 707(d) to file charges in criminal court does not implicate any protected interest of petitioners that gives rise to the requirements of procedural due process.

## V

Petitioners next challenge section 707(d) on the ground that it violates their right to the equal protection of the laws (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7; *id.,* art. IV, § 16, subd. (a)), because the statute permits identically situated minors to be subject to different laws and disparate treatment at the discretion of the prosecutor. Petitioners assert that minors of the same age and charged with the same crime under the circumstances enumerated in section 707(d) are subject either to the juvenile court law or to the criminal justice system, based solely upon a prosecutorial decision that is unguided by any statutory standards. According to petitioners, the creation of two classes of minors pursuant to section 707(d) implicates fundamental liberty interests, and the disparity in treatment of minors

falling within the scope of the statute is neither justified by a compelling state interest nor rationally related to a legitimate interest. Therefore, they contend, section 707(d) is unconstitutional on its face. We conclude that petitioners' equal protection claim lacks merit.

To succeed on their claim under the equal protection clause, petitioners first must show that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner. (*In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549].) Petitioners do not challenge the classification expressly set forth in section 707(d)—that is, they do not contend that the disparate treatment of minors who meet the criteria set forth in section 707(d), and of minors who do not meet such criteria, is impermissible. (See *Hicks v. Superior Court, supra,* 36 Cal.App.4th 1649 [statutory presumption of unfitness applicable only to limited class of minors does not violate the equal protection clause].) Instead they assert that section 707(d) authorizes *prosecutors* to create two classes of minors, both of which satisfy the criteria set forth in the statute. One class consists of those minors against whom prosecutors choose to file criminal charges in criminal court; the other consists of minors accused of having committed the same offenses, but against whom prosecutors choose to file wardship petitions in juvenile court. These two classes of minors are affected in an unequal manner, petitioners observe, because application of the juvenile court law or the criminal law can give rise to significantly different rights and penalties for similarly situated minors.

As petitioners implicitly concede, all minors who meet the criteria enumerated in section 707(d) equally are subject to the prosecutor's discretion whether to file charges in criminal court. Any unequal treatment of such minors who commit the same crime under similar circumstances results solely from the decisions of individual prosecutors whether to file against particular minors a petition in juvenile court or instead an accusatory pleading in criminal court. Although, as petitioners assert, a prosecutor's decision in this regard can result in important consequences to the accused minor, so does a decision by a prosecutor to initiate criminal charges against *any* individual, including an adult. Claims of unequal treatment by prosecutors in selecting particular classes of individuals for prosecution are evaluated according to ordinary equal protection standards. (*Baluyut v. Superior Court* (1996) 12 Cal.4th 826, 836 [50 Cal.Rptr.2d 101, 911 P.2d 1].) These standards require the defendant to show that he or she has been singled out deliberately for prosecution on the basis of some invidious criterion, and that the prosecution would not have been pursued except for the discriminatory purpose of the prosecuting authorities. (*Id.* at p. 832.) "[A]n invidious purpose for prosecution is one that is arbitrary and thus unjustified because

it bears no rational relationship to legitimate law enforcement interests . . . ." (*Id.* at p. 833.)

Section 707(d) contains no overtly discriminatory classification. In their challenge to section 707(d), petitioners do not contend that the district attorney filed charges against them in criminal court on the basis of some invidious criterion or for a discriminatory purpose, or that section 707(d) has had any discriminatory effect. Petitioners instead contend that section 707(d) *might* result in invidious discrimination because it contains no standards guiding the prosecutor's discretion whether to file charges in criminal court. Similarly, several amici curiae[8] assert that historical data regarding racial disparities in the juvenile justice system suggest that section 707(d) *likely* will exacerbate such inequities. Such speculation is insufficient to establish a violation of the equal protection clause.

Moreover, numerous decisions have upheld statutes conferring upon prosecutors the authority to make analogous decisions. For example, in *Davis*, *supra*, 46 Cal.3d 64, we determined that a provision limiting a defendant's eligibility for diversion to cases in which the prosecutor charged a wobbler as a misdemeanor did not violate equal protection principles. Our opinion explained that the eligibility rule was "no different than any other legislative rule which accords differential treatment to an individual depending on whether a prosecutor believes a greater or lesser charge is appropriate." (*Id.* at p. 87.) We relied upon *United States v. Batchelder* (1979) 442 U.S. 114 [99 S.Ct. 2198, 60 L.Ed.2d 755] (*Batchelder*), which upheld a prosecutor's discretion to charge the defendant pursuant to a statute imposing a penalty that was harsher than that imposed by another statute proscribing precisely the same conduct. The high court held that in the absence of any showing that the prosecutor's exercise of discretion had been based upon an unjustifiable standard such as race, religion, or other arbitrary classification, the existence of such prosecutorial discretion did not violate equal protection principles. The high court's decision in *Batchelder* stated: "[T]here is no appreciable difference between the discretion a prosecutor exercises when deciding whether to charge under one of two statutes with different elements and the discretion he exercises when choosing one of two statutes with identical elements. In the former situation, once he determines that the proof will support conviction under either statute, his decision is indistinguishable from the one he faces in the latter context. The prosecutor may be influenced by the penalties available upon conviction, but this fact, standing alone, does not give rise to a violation of the Equal Protection or Due Process Clause.

---

[8]The Youth Law Center, Juvenile Law Center, Child Welfare League of America, National Council of La Raza, National Mental Health Association, National Urban League, and Sentencing Project.

[Citations.] Just as a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution neither is he entitled to choose the penalty scheme under which he will be sentenced. [Citations.]" (*Id.* at p. 125 [99 S.Ct. at p. 2205].)

A prosecutor's discretionary decision pursuant to section 707(d) is similar to the prosecutor's decision considered in *Batchelder*. Depending upon the prosecutor's exercise of his or her traditional charging discretion, similarly situated minors who have engaged in the same criminal conduct may be prosecuted under distinct statutory schemes, one of which can give rise to harsher penalties upon conviction. As is apparent from the preceding part of this opinion, petitioners possess no right to be subject to the juvenile court law. Therefore, like the defendant in *Batchelder*, petitioners are not entitled to elect which of two applicable statutes shall be the basis of the adjudication of the charges against them, or to choose the statutory scheme under which they will be sentenced upon conviction.

■ The decision to file charges in criminal court pursuant to section 707(d) also is analogous to a prosecutor's decision to pursue capital charges against a defendant. It long has been held that "prosecutorial discretion to select those eligible cases in which the death penalty will actually be sought does not in and of itself . . . offend principles of equal protection . . . . [Citations.]" (*People v. Keenan, supra,* 46 Cal.3d at p. 505.) "Many circumstances may affect the litigation of a case chargeable under the death penalty law. These include factual nuances, strength of evidence, and, in particular, the broad discretion to show leniency. Hence, one sentenced to death under a properly channeled death penalty scheme cannot prove a constitutional violation by showing that other persons whose crimes were superficially similar did not receive the death penalty. [Citations.] The same reasoning applies to the prosecutor's decisions to pursue or withhold capital charges at the outset." (*Id.* at p. 506; see also *People v. Andrews* (1998) 65 Cal.App.4th 1098 [76 Cal.Rptr.2d 823] [differing prosecutorial charging policies with regard to the Three Strikes law do not violate the equal protection clause].)

■ Thus, petitioners cannot establish a violation of their right to the equal protection of the laws by showing that other minors in circumstances similar to those of petitioners can be prosecuted under the juvenile court law. Section 707(d) limits the prosecutor's discretion to file charges in criminal court to minors of a specified age who commit enumerated crimes under certain circumstances, and at the preliminary hearing the magistrate must find reasonable cause to believe that the minor has committed such a crime under those circumstances. In addition, the prosecutor's decision is subject to constitutional constraints against invidious discrimination (*Murgia v.*

*Municipal Court* (1975) 15 Cal.3d 286, 293-301 [124 Cal.Rptr. 204, 540 P.2d 44]) and against vindictive or retaliatory prosecution (*In re Bower* (1985) 38 Cal.3d 865, 873-874 [215 Cal.Rptr. 267, 700 P.2d 1269]). Therefore, contrary to petitioners' contention, the prosecutor's decision is not unfettered or entirely without standards. The prosecutor's discretion to select those statutorily eligible cases in which to seek a criminal disposition against a minor—based upon permissible factors such as the circumstances of the crime, the background of the minor, or a desire to show leniency, for example—does not violate the equal protection clause.

Several decisions from other jurisdictions are consistent with our conclusion that section 707(d) does not deprive petitioners of the equal protection of the laws. For example, in *State v. Angel C., supra*, 715 A.2d at page 671, the Connecticut Supreme Court stated, with regard to a statute authorizing the prosecutor to file charges against minors in criminal court, that "the mere fact that a statute permits the prosecutor to treat one individual charged with a specific crime differently from another individual charged with the same crime or a crime of similar magnitude does not render the statute discriminatory on its face." Similarly, the court in *People v. Thorpe, supra*, 641 P.2d at page 940, "reject[ed] the defendant's argument that he was denied equal protection of the law because the district attorney chose to file a criminal action against him whereas another in his same circumstance could be treated as a juvenile and charged with delinquency." (Accord, *People v. Hughes* (Colo.Ct.App. 1997) 946 P.2d 509, 515-516, overruled on another point in *Valdez v. People* (Colo. 1998) 966 P.2d 587, 591; *Hansen v. State, supra*, 904 P.2d at pp. 818-819.)

In connection with their equal protection claim, petitioners independently rely upon article IV, section 16, subdivision (a), of the California Constitution (hereafter article IV, section 16(a)), which states: "All laws of a general nature have uniform operation." Petitioners contend that Welfare and Institutions Code section 707(d) denies them the right to the uniform operation of the laws, because different prosecutors throughout the state are authorized to charge identically situated minors in either juvenile court or criminal court. Therefore, petitioners continue, section 707(d) does not "have uniform operation" as required by article IV, section 16(a).

This court has stated that article IV, section 16(a), and other equal protection provisions in the California Constitution[9] "have been generally thought in California to be substantially the equivalent of the equal protection clause of the Fourteenth Amendment to the United States Constitution."

---

[9]"A person may not be . . . denied equal protection of the laws . . . ." (Cal. Const., art. I, § 7, subd. (a).)

(*Department of Mental Hygiene v. Kirchner* (1965) 62 Cal.2d 586, 588 [43 Cal.Rptr. 329, 400 P.2d 321]; see also *Niedle v. Workers' Comp. Appeals Bd.* (2001) 87 Cal.App.4th 283, 288 [104 Cal.Rptr.2d 534].) Although we recognize our authority to construe the state Constitution independently (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1152, fn. 19 [81 Cal.Rptr.2d 492, 969 P.2d 584]), this court has not done so when considering analogous claims of arbitrary prosecution. ██ Consequently, we deem our analysis of petitioners' equal protection claim under the Fourteenth Amendment to the United States Constitution also applicable to their equal protection claim made pursuant to provisions in the California Constitution, including article IV, section 16(a). Accordingly, for the reasons set forth above, we reject petitioners' contention that Welfare and Institutions Code section 707(d) violates article IV, section 16(a).

In support of their claim based upon article IV, section 16(a), petitioners rely upon a divided decision of the Utah Supreme Court—*State v. Mohi* (Utah 1995) 901 P.2d 991 (*Mohi*)—which invalidated a statute conferring upon prosecutors the discretion to file charges against minors directly in criminal court. The holding in *Mohi* was based exclusively upon a provision in the Utah Constitution identical to article IV, section 16(a). As the plurality opinion in *Mohi* emphasized, however, Utah's constitutional provision concerning uniform operation of the laws established requirements different from those of the federal equal protection clause. (901 P.2d at p. 997.) Indeed, a plurality of that state court previously had held that a prior version of the "direct-filing statute" invalidated in *Mohi* did *not* violate the federal equal protection clause. (*State v. Bell* (Utah 1989) 785 P.2d 390, 395-405.)

In any event, we are not persuaded by the reasoning of the plurality opinion in *Mohi*.[10] The opinion contrasted a prosecutor's traditional charging discretion with the prosecutor's assertedly arbitrary discretion to file charges against a minor directly in criminal court. According to the plurality opinion, traditional charging discretion concerned *which* law to apply to a single offender, whereas direct-filing discretion involved how to apply the *same* law to different offenders. (*Mohi, supra*, 901 P.2d at pp. 1003-1004.) Because the challenged statute permitted prosecutors to treat different offenders

---

"A citizen or class of citizens may not be granted privileges or immunities not granted on the same terms to all citizens. . . ." (Cal. Const., art. I, § 7, subd. (b).)

[10]Two justices of the Utah Supreme Court signed the plurality opinion. Stating that it was "a close case," the Chief Justice authored a separate concurring opinion joining the plurality and adhering to the reasoning of the concurring and dissenting opinion in *State v. Bell, supra*, 785 P.2d 390, 407. (*Mohi, supra*, 901 P.2d at p. 1007 (conc. opn. of Zimmerman, C. J.).) Two justices signed a concurring and dissenting opinion disagreeing with the court's holding that the direct-filing provision violated the state constitutional requirement concerning uniform operation of the laws. (*Ibid.*)

accused of the same criminal offense differently, without any statutory criteria to guide the prosecutors' decisions, the plurality opinion held that the law operated "nonuniformly on similarly situated juveniles" and thus violated the state constitutional requirement of uniform operation of the laws. (*Id.* at p. 1004.)

Contrary to the reasoning of the plurality opinion in *Mohi,* however, traditional prosecutorial charging discretion, which includes the discretion not to bring *any* charges against a particular offender, encompasses decisions how to apply the same law to different offenders, often without any express statutory criteria guiding such decisions. Thus, prosecutors properly may decide that some individuals who have engaged in criminal conduct proscribed by a particular penal statute should not be prosecuted at all. Prosecutors may charge some defendants with a misdemeanor violation of the statute, and others with a felony violation. With regard to some offenders, prosecutors may seek the maximum penalty authorized by the statute, while offering to recommend probation or diversion for other offenders. None of these prosecutorial decisions, unless based upon invidious discrimination or retaliatory motive, ever has been considered to be unconstitutionally arbitrary. Therefore, prosecutorial discretion resulting in the different application of the same law to different offenders does not necessarily violate the requirement of uniform operation of the laws.

In light of prior case authority considering prosecutorial charging discretion, discussed above, we conclude that section 707(d) does not deprive petitioners of the equal protection (or the uniform operation) of the laws.

## VI

Finally, petitioners contend that Proposition 21 is invalid in its entirety because it violates the single-subject rule set forth in article II, section 8, subdivision (d), of the California Constitution (hereafter article II, section 8(d)), which provides that "[a]n initiative measure embracing more than one subject may not be submitted to the electors or have any effect." Petitioners assert that Proposition 21 addresses three subjects: (1) gang-related crime, (2) the sentencing of repeat offenders, and (3) the juvenile justice system. According to petitioners, these subjects do not relate to a sufficiently defined common theme or purpose to satisfy the requirements of article II, section 8(d). In addition, petitioners contend that Proposition 21 violates the single-subject rule because voters were not adequately informed of the provisions regarding repeat offenders, and because the proposal to authorize prosecutors to file charges against minors directly in criminal court (Welf. & Inst. Code, § 707(d)) should have been submitted as a separate initiative.

We begin our analysis of petitioners' claim by summarizing the provisions of Proposition 21. Section 1 sets forth the short title of the measure—the Gang Violence and Juvenile Crime Prevention Act of 1998. (Ballot Pamp., Primary Elec. (Mar. 7. 2000) text of Prop. 21, § 1, p. 119 (Ballot Pamphlet).)

Section 2 contains findings and declarations, which refer to the growing problem of juvenile and gang-related violent crime, the inability of the juvenile justice system to protect the public adequately from violent juvenile offenders, the goal of devoting fewer resources of the juvenile court to violent offenders and more to those offenders who can be rehabilitated, the desirability of eliminating confidentiality in some juvenile proceedings in order to hold juvenile offenders more accountable for their actions, and the need to increase penalties for gang-related felonies. (Ballot Pamp., *supra*, text of Prop. 21, p. 119.)

Sections 3 through 13 of the initiative are related to criminal gang activity. (Ballot Pamp., *supra*, text of Prop. 21, pp. 119-123.) Sections 3 through 10 amend the Street Terrorism Enforcement and Prevention (STEP) Act (Pen. Code, § 186.20 et seq.), which addresses the problem of violent street gangs. Section 11 amends Penal Code section 190.2 to add gang-related murder as a special circumstance permitting the imposition of the death penalty or a sentence of life without the possibility of parole. Section 12 addresses the crime of vandalism of property, including graffiti. Section 13 amends Penal Code section 629.52 to authorize wiretaps in cases arising under the STEP Act and in cases involving possession of moneys involved in the unlawful sale of controlled substances.

Sections 14 through 17 of Proposition 21 amend portions of the Three Strikes law. (Ballot Pamp., *supra*, text of Prop. 21, pp. 123-125.) Section 15 alters the list of "violent felonies" (Pen. Code, § 667.5, subd. (c)), and section 17 modifies the list of "serious felonies" (Pen. Code, § 1192.7, subd. (c)), for which enhanced sentences are required. (See Pen. Code, § 667.) Sections 14 and 16 change the "lock-in" date for determining the existence of qualifying offenses (such as violent or serious felonies) under the Three Strikes law. Thus, before the passage of Proposition 21, references to existing statutes, such as the law defining violent felonies, in Penal Code section 667 were "to statutes as they existed on June 30, 1993." (Pen. Code, § 667, subd. (h).) Section 14 of Proposition 21 provides that references to existing statutes in Penal Code section 667, for all offenses committed on or after the effective date of the initiative, are to those statutes as they existed on the effective date of Proposition 21 (March 8, 2000), including, but not limited to, amendments made to those statutes by this initiative. (Pen. Code, § 667.1.) Section 16 of the initiative makes a corresponding change to the

lock-in date for statutes referenced in Penal Code section 1170.12. (Pen. Code, § 1170.125.)

Sections 18 through 34 of Proposition 21 amend provisions of the Welfare and Institutions Code concerning the juvenile justice system. (Ballot Pamp., *supra*, text of Prop. 21, pp. 125-131.) In addition to the revisions related to charging minors in criminal court and restricting juvenile court dispositions for certain minors, changes made by these sections include limitations on the confidentiality of juvenile criminal records, restrictions on the prehearing release of minors accused of specified offenses, and revisions to various procedures and evidentiary rules in juvenile wardship proceedings.

Petitioners contend that each of the foregoing subjects addressed by Proposition 21—gang violence, the sentencing of repeat offenders, and juvenile crime—are distinct and unrelated to one another. The unifying theme and purpose of the initiative, according to petitioners, is to create a "safer California." (Ballot Pamp., *supra*, text of Prop. 21, § 2, subd. (k), p. 119 ["This act addresses each of these issues with the goal of creating a safer California"].) Petitioners assert that, although the subjects addressed by Proposition 21 might be related to the general goal of reducing crime, such a goal is too broad to satisfy the requirements of the single-subject rule.

"In articulating the proper standard to guide analysis in this context, the governing decisions establish that ' " '[a]n initiative measure does not violate the single-subject requirement if, despite its varied collateral effects, *all of its parts are "reasonably germane"* to each other,' and to the general purpose or object of the initiative." ' [Citation.] As we recently have explained, 'the single-subject provision does not require that each of the provisions of a measure effectively interlock in a functional relationship. [Citation.] It is enough that the various provisions are reasonably related to a common theme or purpose.' [Citation.] Accordingly, we have upheld initiative measures ' "which fairly disclose *a reasonable and common sense relationship among their various components in furtherance of a common purpose.*" [Citation.]' [Citation.]" (*Senate of the State of Cal. v. Jones* (1999) 21 Cal.4th 1142, 1157 [90 Cal.Rptr.2d 810, 988 P.2d 1089].) The common purpose to which the initiative's various provisions relate, however, cannot be " 'so broad that a virtually unlimited array of provisions could be considered germane thereto and joined in this proposition, essentially obliterating the constitutional requirement.' [Citation.]" (*Id.* at p. 1162.)

As Proposition 21 itself reveals, the purpose of the measure is narrower than that identified by petitioners. The general object of the initiative is to address the problem of violent crime committed by juveniles

and gangs—not simply to reduce crime generally. This narrower purpose is reflected in the title of the initiative—the Gang Violence and Juvenile Crime Prevention Act of 1998—as well as in the findings and declarations set forth in the initiative. Section 2 of Proposition 21 recites statistics indicating that serious and violent juvenile crime has increased significantly, and that the problem of youth and gang violence is projected to grow substantially over the next decade. This section further states that criminal street gangs and gang-related violence pose a significant threat to public safety, and asserts that gang-related felonies warrant severe penalties. Among other declarations in section 2 is the assertion that "[t]he juvenile justice system is not well-equipped to adequately protect the public from violent and repeat serious juvenile offenders." (Ballot Pamp., *supra*, text of Prop. 21, § 2, subd. (i), p. 119.)

Addressing the problem of juvenile crime and gang-related crime properly can be considered the common purpose of Proposition 21. Although, as petitioners assert, juvenile crime is not coterminous with violent gang crime, a significant portion of criminal gang activity is undertaken by juveniles. A recent report issued by the United States Department of Justice indicates that in 1998, approximately 40 percent of all gang members were under the age of 18 years. (Off. of Juvenile Justice and Delinquency Prevention, 1998 Nat. Youth Gang Survey (Nov. 2000) pp. 14-15 <http://virlib.ncjrs.org/JuvenileJustice.asp> [as of Feb. 28, 2002].) Thus, it would be difficult to attempt to combat the problem of juvenile crime without also considering gang-related crime; conversely, measures to address gang-related crime without dealing with juveniles involved in criminal activity could prove inadequate. Accordingly, Proposition 21 contains provisions that impose harsher penalties both for gang-related crimes and for serious crimes committed by juveniles. In addition, the initiative alters aspects of the juvenile justice system in order to render certain minors more accountable for serious crimes (including gang-related crimes), for example by authorizing prosecution of these minors in criminal court. Thus, the provisions of Proposition 21 that change laws regarding gang-related crime and the juvenile justice system are reasonably germane to each other and to the initiative's common purpose of addressing violent crime committed by juveniles and gangs. This subject or goal clearly is not so broad that an unlimited array of provisions could be considered relevant thereto. Indeed, as the People emphasized at oral argument, in previous decisions we have upheld initiatives containing various provisions related to even broader goals in the criminal justice system. (E.g., *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 347 [276 Cal.Rptr. 326, 801 P.2d 1077] [promoting the rights of actual and potential crime victims]; *Brosnahan v. Brown* (1982) 32 Cal.3d 236, 247 [186 Cal.Rptr. 30, 651 P.2d 274] [strengthening procedural and substantive safeguards for victims in the criminal justice system].)

Petitioners contend that even if addressing juvenile and gang-related crime constitutes a proper common goal for purposes of the single-subject rule, the provisions of Proposition 21 that amend the Three Strikes law are unrelated to that goal and constitute a distinct subject that should have been submitted to the electorate as a separate measure. We disagree. These revisions bear a reasonable and commonsense relationship to the initiative's provisions regarding juvenile and gang-related crime.

As described above, Proposition 21 added a number of crimes to the list of violent and serious felonies that qualify as strikes under the Three Strikes law.[11] The violent felonies now qualifying as strikes under the measure include robbery; kidnapping; assault with intent to commit mayhem, rape, sodomy, or oral copulation; carjacking; extortion or threats to victims or witnesses in connection with gang activity; first degree burglary; and the use of a firearm in connection with the commission of specified felonies. (Pen. Code, § 667.5, subd. (c), as amended by Prop. 21, § 15.) The serious felonies qualifying as strikes under the initiative include exploding a destructive device causing bodily injury; certain felonies committed in connection with a street gang in violation of Penal Code section 186.22; throwing acid or a flammable substance; assault with a deadly weapon; assault on a peace officer or firefighter; assault with a deadly weapon against a public transit employee, custodial officer, or school employee; discharge of a firearm at an inhabited dwelling, vehicle, or aircraft; rape in concert; shooting from a vehicle; intimidation of victims or witnesses; and terrorist threats. (Pen. Code, § 1192.7, subd. (c), as amended by Prop. 21, § 17.)

Although some of these crimes, at first blush, might not bear an obvious relationship to juvenile or gang offenders, upon closer scrutiny we cannot properly conclude that they are not reasonably related to the goal of the initiative. For example, assault with a deadly weapon and burglary constitute crimes that commonly are committed by street gangs. In 1998, 53 percent of local jurisdictions nationwide reported that youth gang members often or sometimes used firearms in assault crimes. (Off. of Juvenile Justice and Delinquency Prevention, 1998 Nat. Youth Gang Survey, *supra*, at p. 32.) In the western region of the nation (including California), 27 percent of jurisdictions reported that youth gang members *often* used firearms in assault crimes; 35 percent reported that such persons *sometimes* used firearms in assault crimes. (*Ibid.*) Similarly, 58 percent of jurisdictions reported that "most/all" or "some" youth gang members in their region committed burglaries. (*Id.* at p. 31.)

---

[11]The Legislature added some of these crimes to the list of violent and serious felonies before the passage of Proposition 21, but those crimes did not qualify as strikes until Proposition 21 amended the statutory lock-in date for determining qualifying offenses under the Three Strikes law. (See Pen. Code, §§ 667.1, 1170.125.)

Even if some of the crimes added to the list of violent and serious felonies are *more likely* to be committed by an adult who is not a gang member, the offenses nonetheless constitute crimes that commonly are committed by members of street gangs and/or juvenile offenders and thus bear a reasonable and commonsense relationship to the purpose of the initiative. We are not confronted with an initiative that purports to address juvenile and gang-related crime, but that also contains a few provisions that relate *solely* to adults who are not members of gangs, such as an amendment to the Three Strikes law that would affect only a defendant who, as an adult, previously had been convicted of a strike unrelated to gang activity. The circumstance that the Three Strikes provisions affect adults in addition to juveniles and gang members does not mean that these provisions are not reasonably germane to the purpose of the initiative.

Furthermore, certain juveniles in wardship proceedings who are found to have committed violent or serious felonies within the meaning of the Three Strikes law can accumulate strike priors that result in enhanced sentences in future criminal prosecutions. (Pen. Code, § 667, subd. (d)(3).) In addition, adult gang members, as well as juveniles prosecuted in criminal court, who commit such crimes are subject to the increased penalties and other restrictions imposed by the Three Strikes law, such as limitations upon plea negotiation and upon conduct credits. (Pen. Code, §§ 1192.7, subd. (a), 2933.1.) These provisions further the initiative's goal of preserving juvenile court resources for less violent offenders who are more likely to benefit from rehabilitation. Furthermore, no minor shall be committed to the Youth Authority when he or she is convicted in a criminal action of a violent or serious felony as set forth in Penal Code sections 667.5 and 1192.7 and receives a sentence of a specified length. (Welf. & Inst. Code, § 1732.6, subd. (a).)

Thus, the list of violent and serious felonies contained in the Three Strikes law bears both a topical and a functional relationship to provisions regarding juvenile crime. Revising the list of violent and serious felonies to add crimes for which juveniles and gang members can receive increased penalties is reasonably germane to the initiative's general purpose of addressing juvenile and gang-related crime. In addition, changing the lock-in date (that is, the effective date of relevant statutes) for determining the existence of strikes is necessary to give effect to this list of violent and serious felonies as revised by Proposition 21. "[I]t is well established that an initiative may have 'collateral effects' without violating the single-subject rule. [Citations.]" (*Kennedy Wholesale, Inc. v. State Bd. of Equalization* (1991) 53 Cal.3d 245, 254-255 [279 Cal.Rptr. 325, 806 P.2d 1360].) Thus, despite the collateral effects of these provisions upon adults who are not gang members, and

despite the circumstance that the new lock-in date has the incidental effect of adding strikes that the Legislature previously had included in the list of violent and serious felonies, the provisions remain relevant to the common purpose of Proposition 21.[12]

Petitioners further contend that Proposition 21 violates the single-subject rule because voters were not adequately informed of the changes to the Three Strikes law effected by Proposition 21, or of the circumstance that these changes concerned laws enacted through prior initiative measures. According to petitioners, nothing in the title, findings, declarations, or ballot pamphlet arguments mention this "major revision" to the Three Strikes law. Petitioners contend that this revision includes provisions that relate solely to adult offenders who are not members of gangs, that the revision therefore is unrelated to the purpose of Proposition 21, and that voters thus were likely to be confused regarding the effect of the initiative.

Petitioners' claim of voter confusion is refuted by the materials in the ballot pamphlet presented to the voters. The official summary of Proposition 21 prepared by the Attorney General, as well as the analysis of the measure by the Legislative Analyst, clearly and prominently refer to the proposed changes to the Three Strikes law. Thus, the Attorney General's summary states that Proposition 21 "[d]esignates additional crimes as violent and serious felonies, thereby making offenders subject to longer sentences." (Ballot Pamp., *supra*, official title and summary of Prop. 21, p. 44.) The Legislative Analyst's summary states in part: "This measure makes various changes to laws specifically related to the treatment of juvenile offenders. In addition, it changes laws for juveniles *and adults* who are gang-related offenders, *and those who commit violent and serious crimes.* Specifically, it: [¶] . . . [¶] . . . Increases criminal penalties for certain serious and violent offenses." (*Id.*, analysis of Prop. 21 by Legis. Analyst, p. 45, italics added.) The Legislative Analyst then describes in greater detail each of the changes proposed by Proposition 21. In a separate section titled "Serious and Violent Felony Offenses," the Legislative Analyst describes the general effect of the Three Strikes law, as well as the proposed revisions that would be made by the initiative: "This measure revises the lists of specific crimes defined as serious or violent offenses, thus making most of them subject to the longer

---

[12]In light of our conclusion that the provisions of Proposition 21 fairly disclose a reasonable and commonsense relationship among their various components in furtherance of a common purpose, we also reject petitioners' contention that the initiative constituted an instance of "logrolling," or combining in a single measure several unrelated provisions that might not have commanded majority support if considered separately. (See *Senate of the State of Cal. v. Jones, supra*, 21 Cal.4th 1142, 1151 & fn. 5; *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 231-232 [149 Cal.Rptr. 239, 583 P.2d 1281].)

sentence provisions of existing law related to serious and violent offenses. In addition, these crimes would count as 'strikes' *under the Three Strikes law."* (*Id.* at pp. 46-47, italics added.)

"We must assume the voters duly considered and comprehended these materials. [Citations.]" (*Raven v. Deukmejian, supra,* 52 Cal.3d 336, 349.) Accordingly, we find no indication that the voters were unaware that Proposition 21 amended the list of serious and violent felonies for which longer sentences may be imposed.

In a related argument, several amici curiae[13] contend that Proposition 21 violates the single-subject rule because voters were not informed that the foregoing revisions to the Three Strikes law amended statutes adopted through prior initiative measures. Amici curiae contend that, because these statutes can be amended only by a two-thirds vote of the Legislature or by another initiative measure (see Cal. Const., art. II, § 10, subd. (c)), the proponents of Proposition 21 were required to alert voters that the measure would amend prior laws enacted through the initiative process. This contention is unsupported by any legal authority, however. As established above, the electorate properly was informed of the revisions to the Three Strikes law effected by Proposition 21. Voters need not have known that the Three Strikes law was enacted by initiative in order to comprehend the changes to that law made by Proposition 21.

Lastly, petitioners contend that Proposition 21 violates the single-subject rule because section 707(d), as amended by the initiative, effected a reallocation of judicial power to the executive branch. Such a transfer of power constitutes a single subject within the meaning of article II, section 8(d), petitioners contend, and therefore should have been submitted to the voters in a single initiative. Petitioners rely upon *Senate of the State of Cal. v. Jones, supra,* 21 Cal.4th 1142, in which we held that an initiative violated the single-subject rule where it would have (1) changed laws regarding the compensation of state officers and (2) transferred the power of reapportionment from the Legislature to this court. Our decision reasoned that the proposal to transfer the power of reapportionment from the Legislature, where it traditionally had resided, to the Supreme Court, involved "a most fundamental and far-reaching change in the law" that "clearly represent[ed] a separate 'subject' within the meaning of the single-subject rule upon which

---

[13]American Civil Liberties Union of Northern California, American Civil Liberties Union of Southern California, American Civil Liberties Union of San Diego and Imperial Counties, League of Women Voters of California, California Teachers Association, Children's Advocacy Institute, Coleman Advocates for Children and Youth, and Pacific Juvenile Defender Center.

a clear expression of the voters' intent is essential." (*Id.* at pp. 1167-1168.) We concluded that authorizing the combination of such a provision with unrelated provisions concerning the pay of state officers "would inevitably create voter confusion and obscure the electorate's intent with regard to each of the separate subjects included within the initiative, undermining the basic objectives sought to be achieved by the single-subject rule." (*Id.* at p. 1168.)

As we have explained, however, the various provisions of Proposition 21, including the provision authorizing prosecutors to file charges against certain minors directly in criminal court, are reasonably germane to the common purpose of reducing gang-related and juvenile crime. Including such a relevant provision in an initiative addressing this single subject is not likely to confuse the voters or obscure the electorate's intent. Moreover, conferring upon the prosecutor the discretion to pursue charges against a minor in criminal court does not comprise "a most fundamental and far-reaching change in the law" that clearly represents a single subject upon which a clear expression of the voters' intent is essential. (*Senate of the State of Cal. v. Jones, supra,* 21 Cal.4th at pp. 1167-1168.) As established above, prosecutors traditionally have exercised charging discretion with regard to minors accused of criminal conduct, and such prosecutorial decisions often have determined whether the accusations were adjudicated in juvenile court or criminal court. Incrementally expanding such discretion to include the authority to file charges in criminal court under the circumstances set forth in section 707(d) does not reallocate the judicial power, nor does it accomplish such a fundamental change in the law that this provision must be considered a single subject that can be submitted to the electorate only as an individual measure, without the other related provisions of Proposition 21.[14] All these provisions are germane to the initiative's common purpose of addressing gang-related and juvenile crime, and satisfy the requirements of the single-subject rule set forth in article II, section 8(d).

---

[14]Similarly, contrary to the assertion of amici curiae law professors and juvenile justice specialists (Franklin E. Zimring, Elizabeth Cauffman, Laurence Steinberg, Dean Hill Rivkin, Jeffrey Fagan, Darrell F. Hawkins, Peter Edelman, Jan C. Costello, Mercer Sullivan, Elizabeth Scott, and William Patton), other revisions accomplished by Proposition 21 do not constitute "a wholesale invasion of judicial branch authority and function," but rather represent modest, incremental changes to the existing statutory scheme. Indeed, most of the revisions upon which amici curiae rely retain significant judicial authority and discretion in the process. (E.g., Welf. & Inst. Code, §§ 707, subd. (c) [extending a presumption against fitness to minors who are 14 and 15 years of age and accused of certain offenses], 625.3 [prohibiting the prehearing release of minors at least 14 years of age taken into custody for certain offenses], 654.3, subd. (h) [designating program of probation for certain minors charged with felony offenses "[e]xcept in unusual cases where the court determines the interest of justice would best be served by" another program], 707(d)(5) [requiring the juvenile court to choose among particular dispositions for minors who are found to have committed certain offenses]; see also Pen. Code, § 1385, subd. (a) [court may dismiss action in furtherance of justice].)

## VII

The judgment of the Court of Appeal is reversed.

Baxter, J., Chin, J., and Brown, J., concurred.

**WERDEGAR, J.**—I concur in the judgment and, in all but one respect, in the majority opinion's reasoning. I write separately to explain my reasons for agreeing that Proposition 21 does not violate the single-subject limitation imposed on initiative measures by article II, section 8, subdivision (d) of the California Constitution.

As the majority explains (maj. opn., *ante*, at p. 576), the problems of violent gang crime and juvenile crime are so closely interrelated that they can reasonably be considered the common subject Proposition 21 seeks to address. The difficulty, in terms of the single-subject rule, comes with those provisions changing the "Three Strikes" law's "lock-in" date (Pen. Code, §§ 667.1, 1170.125)[1] and amending the statutory lists of serious (§ 1192.7, subd. (c)) and violent (§ 667.5, subd. (c)) felonies that, among their other roles in sentencing, define the prior convictions that qualify recidivists for sentencing under the Three Strikes law. I would analyze this aspect of the issue somewhat differently than the majority.

By Proposition 21, the voters added to the lists in sections 1192.7 and 667.5 certain offenses clearly related to gangs and/or juvenile crime. Newly designated as serious felonies under section 1192.7 were, for example, felonies committed in promotion of a pattern of criminal gang activity (*id.*, subd. (c)(28)), shooting from a vehicle or at an inhabited dwelling or vehicle (*id.*, subd. (c)(33), (36)), intimidation of witnesses (*id.*, subd. (c)(37)), and making criminal threats (*id.*, subd. (c)(38)). Newly designated as violent felonies under section 667.5 were, for example, extortion in promotion of criminal gang activity (*id.*, subd. (c)(19)) and threatening victims or witnesses in promotion of criminal gang activity (*id.*, subd. (c)(20)).

Qualifying these felonies as "strikes," so as to impose greater punishment on those who repeatedly committed such offenses, was a measure reasonably germane to Proposition 21's purpose of deterring gang and juvenile violence. Adding to the lists in sections 667.5 and 1192.7 would not, by itself, accomplish that task, because the cross-references in the Three Strikes law were statutorily frozen as of June 30, 1993. (See § 667, subd. (h); Stats. 1994, Initiative Statutes, Prop. 84, § 2, p. A-316.) Changing the lock-in date was therefore necessary, though it had the collateral effect of qualifying as

---

[1] All further statutory references are to this code.

strikes *all offenses* added to sections 1192.7 and 667.5 between the initial 1993 date and the passage of Proposition 21, not just those added by the initiative.

As the majority recognizes (maj. opn., *ante*, at pp. 578-579), that an initiative measure has collateral effects outside its subject area does not put the measure in violation of the single-subject rule. (*Kennedy Wholesale, Inc. v. State Bd. of Equalization* (1991) 53 Cal.3d 245, 254-255 [279 Cal.Rptr. 325, 806 P.2d 1360]; *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 230 [149 Cal.Rptr. 239, 583 P.2d 1281].) That some offenses *not particularly* related to juvenile and gang violence became strikes by virtue of Proposition 21's change in the lock-in date, therefore, would not invalidate the measure under the single-subject rule. For this reason, we need not determine whether assault with intent to commit rape, mayhem, sodomy, or oral copulation (§ 1192.7, subd. (c)(29)), a set of crimes already listed in section 1192.7 by virtue of 1998 amendments (Stats. 1998, ch. 936, § 13.5), though qualified as a strike only by virtue of Proposition 21's change in the lock-in date, is germane to Proposition 21's subject.

Of the offenses that *were* added to sections 1192.7 or 667.5 by Proposition 21, a few are of doubtful germaneness to the initiative's gang and juvenile violence subject matter. In particular, assault with a deadly weapon (§ 1192.7, subd. (c)(31)) and burglary of a residence when a resident is present (§ 667.5, subd. (c)(21)) are crimes commonly committed by many types of offenders, juvenile and adult, gang members or not. I disagree with the majority that, simply because juveniles and gang members sometimes or often commit these offenses, their addition to the serious and violent felony lists was germane to Proposition 21's subject. (See maj. opn., *ante*, at p. 577.) Such a broad view of the initiative's subject would render virtually any criminal law provision germane.

On the other hand, I do not believe that the inclusion of these very few doubtfully germane provisions in a broad and complex measure addressing juvenile and gang violence should be deemed a separate "subject" for purposes of article II, section 8, subdivision (d) of the California Constitution. The single-subject rule "should not be interpreted in an unduly narrow or restrictive fashion that would preclude the use of the initiative process to accomplish comprehensive, broad-based reform in a particular area of public concern." (*Senate of the State of Cal. v. Jones* (1999) 21 Cal.4th 1142, 1157 [90 Cal.Rptr.2d 810, 988 P.2d 1089].) As shown above, the vast majority of offenses qualifying as strikes because of Proposition 21 either were closely related to the measure's gang and juvenile violence subject or qualify as

strikes only as a collateral consequence of the initiative's change in the Three Strikes law's lock-in date. The addition of burglary with a resident present and assault with a deadly weapon was, moreover, not completely unrelated to Proposition 21's subject, since these offenses, even if equally or more likely to be committed by an adult who is not a gang member, are also commonly committed by juveniles and gang members. Requiring, in addition, that *each and every* provision of an initiative be *clearly and particularly* related to the initiative's purposes would demand of initiative proposers a degree of precision unrealistic in the drafting of measures effectively reforming California's complicated body of statutory law. (*Kennedy Wholesale, Inc. v. State Bd. of Equalization, supra*, 53 Cal.3d at p. 254.)

For this reason, I agree with the majority that Proposition 21 does not violate our Constitution's single-subject limitation on initiative measures.

**MORENO, J.**—I concur in parts I through V of the majority opinion and concur in the result. But as explained below, I take issue with much of the majority's analysis of the single-subject rule and with the way this court has defined the single-subject rule in prior case law.

I.

On the March 7, 2000 ballot on which Proposition 21 appeared, there were 17 initiatives and one referendum, including complex and important matters involving election reform, limits on same-sex marriages, voting requirements for school bonds, and approval of Indian gaming compacts. The texts of the proposed laws took 56 double-columned pages of small (9 point) type. The ballot summaries and arguments were 78 pages long. It is doubtful that the average judge or lawyer, let alone the average layperson, comprehended all the material within these pages.

Although many of the reforms suggested to reduce the volume and complexity of the legislative choices faced by voters are beyond the scope of this court's power to implement, there is one measure already available to us: the rigorous enforcement of the single-subject rule. It is unlikely that the drafters of the rule in 1948, when there were only eight propositions on the ballot, could have envisioned the initiative explosion that was to occur 40 and 50 years later. But their purpose was clearly to create a more manageable initiative process suitable for the average voter with limited time and resources. The ballot argument in favor of the single-subject rule stated that one of the principal reasons for the single-subject rule is to achieve "simplification and clarification of issues presented to the voters." (Ballot Pamp.,

proposed amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 2, 1948) p. 8.) Elaborating on this purpose, the ballot argument stated: "Today, any proposition may be submitted to the voters by initiative and it may contain any number of subjects. . . . The busy voter does not have the time to devote to the study of long, wordy, propositions and must rely upon such sketchy information as may be received through the press, radio or picked up in general conversation. If improper emphasis is placed upon one feature and the remaining features ignored, or if there is a failure to study the entire proposed amendment, the voter may be misled as to the over-all effect of the proposed amendment. [¶] [The single-subject rule] entirely eliminates the possibility of such confusion inasmuch as it will limit each proposed amendment to one subject and one subject only." (*Ibid.*)

Moreover, as we recognized in *Senate of the State of Cal. v. Jones* (1999) 21 Cal.4th 1142, 1160 [90 Cal.Rptr.2d 810, 988 P.2d 1089], the single-subject rule was also designed to prevent " ' "an unnatural combination of provisions . . . dealing with more than one subject" ' [citations] that have been joined together simply for improper tactical purposes." In other words, the single-subject rule was intended to discourage what has been called "logrolling." (See Minger, *Putting the "Single" Back in the Single-Subject Rule: A Proposal for Initiative Reform in California* (1991) 24 U.C. Davis L.Rev. 879.) *Jones* itself illustrates this type of mischief: a presumably popular measure, reduction of legislative salaries, was conjoined with a less popular measure, shifting reapportionment from the Legislature to this court. The single-subject rule was designed in part to ensure that each legislative measure succeeds or fails on its own merits.

Unfortunately, this court has generally not interpreted the single-subject requirement to accomplish these basic purposes. In our first case to consider the single-subject rule, *Perry v. Jordan* (1949) 34 Cal.2d 87 [207 P.2d 47], this court ignored the language of the ballot argument quoted above. Instead it assumed, without explanation, that the single-subject rule for initiatives should be defined in the same manner as the single-subject requirement imposed on legislation passed by the Legislature, found at the time in article IV, section 24 of the California Constitution. Following case law interpreting this latter section, we concluded that the requirement should " 'be construed *liberally* to uphold proper legislation, all parts of which are reasonably germane.' " (*Perry v. Jordan, supra,* 34 Cal.2d at p. 92, italics added.)

The *Perry* court thus disregarded the ballot argument's specific concern with avoiding information overload and voter confusion, and instead grafted the single-subject rule for the Legislature onto the single-subject requirement for initiatives. But the differences between the initiative and legislative

process are substantial: in the latter case, a proposed bill is scrutinized by legislators and their staffs, is assigned to legislative committees for hearings, is often amended during this process, and is finally reviewed by the Governor. Initiatives do not receive comparable scrutiny, and the voters are unable to amend them. "The result of this inflexibility is that more often than not a proposed initiative represents the most extreme form of law which is considered politically expedient. . . . [¶] It is because of the voters' lesser ability to scrutinize a proposal and their total inability to propose modifications, that the multisubject initiative presents greater dangers than a similar multisubject legislative bill." (*Schmitz v. Younger* (1978) 21 Cal.3d 90, 99-100 [145 Cal.Rptr. 517, 577 P.2d 652] (dis. opn. of Manuel, J.).)

Unfortunately, our subsequent cases have uncritically followed *Perry v. Jordan*, employing a liberally interpreted "reasonably germane" test rather than a test designed, as the ballot argument to the single-subject rule states, to "eliminate[ ] the possibility" of voter confusion caused when "improper emphasis is placed upon one feature and the remaining features [are] ignored." (Ballot Pamp., proposed amends to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 2, 1948) p. 8; see, e.g., *Raven v. Deukmejian* (1990) 52 Cal.3d 336 [276 Cal.Rptr. 326, 801 P.2d 1077] [varied package of criminal justice reforms held not to violate the single-subject rule]; *Brosnahan v. Brown* (1982) 32 Cal.3d 236 [186 Cal.Rptr. 30, 651 P.2d 274] [same].) In so doing, this court has come close to rendering the single-subject rule meaningless.

In contrast, the Florida Supreme Court, for example, has been rigorous in its enforcement of the single-subject requirement as it pertains to voter initiatives that amend the Florida Constitution. (See Fla. Const., art. XI, § 3 [any constitutional revision or amendment by the electorate "shall embrace but one subject and matter directly connected therewith"].) In the seminal case of *Fine v. Firestone* (Fla. 1984) 448 So.2d 984, the court determined that the single-subject rule for constitutional initiatives should be interpreted more strictly than a comparable single-subject requirement imposed on the Legislature, for reasons similar to those discussed above. The court stated the focus of its inquiry as one of determining whether a proposed amendment "has a logical and natural oneness of purpose," considering "whether the proposal affects [separate] function[s] of government" and how "the proposal affects a section of the constitution." (*Id.* at p. 990.) Moreover, the court has also rigorously enforced Florida Statutes section 101.161, which requires the chief purpose of any constitutional amendment submitted to the voters to be clearly contained in an explanatory statement "not exceeding 75 words in length." (See *Advisory Opin. to Atty. Gen. re Pub. Educ.* (Fla. 2000) 778 So.2d 888, 892.) The Florida Supreme Court has accordingly invalidated

a number of initiatives over the last 15 years. (See, e.g., *Advisory Opin. to Atty. Gen. re Pub. Educ., supra*, 778 So.2d at p. 893 [anti-affirmative-action initiative concerned with three distinct subjects—public education, public employment, and public contracting—violates single-subject rule]; *Advisory Opinion to Attorney General* (Fla. 1997) 699 So.2d 1304 [same for initiative that would create exception to single-subject rule for property rights and tax reform measures]; *Advisory Opinion to Atty. Gen. re Tax* (Fla. 1994) 644 So.2d 486 [same for initiative reforming both taxes and user fees]; *Evans v. Firestone* (Fla. 1984) 457 So.2d 1351 [same for initiative that would cap tort damages and reform summary judgment proceedings]; *Fine, supra*, 448 So.2d 984 [same for initiative that reforms taxation, user fees, and use of revenue bonds for capital improvement].)

While the Florida Supreme Court's interpretation of its own single-subject rule may be somewhat overly stringent for California, some kind of reasonable middle ground between that court's rigor and this court's laxity seems in order. To be sure, there are inherent conceptual difficulties in formulating the proper constitutional standard for enforcing the single-subject requirement. As commentators have pointed out, the term "subject" is problematic to define with any precision because almost any two legislative measures may be considered part of the same subject if that subject is defined with sufficient abstraction. (See Lowenstein, *California Initiatives and the Single Subject Rule* (1983) 30 UCLA L.Rev. 936, 938-942 (Lowenstein).) But our task is made simpler if the rule's purpose of avoiding voter confusion and logrolling is kept in mind. Some have suggested that a provision is reasonably germane to the main subject of the initiative if it can be surmised that the public would consider it to be. (Uelman, *Handling Hot Potatoes: Judicial Review of California Initiatives after Senate v. Jones* (2001) 41 Santa Clara L.Rev. 999, 1009-1010; Lowenstein, *supra*, 30 UCLA L.Rev. at p. 973.) A variation on this formulation proposed by the California Commission on Campaign Financing is whether a "reasonable voter" would be "surprised" to learn that a specific provision being challenged was included in the initiative under question. (Cal. Com. on Campaign Financing Democracy by Initiative: Shaping California's Fourth Branch of Government (1992) p. 330, fn. 97.) Moreover, as has been recognized, the single subject of the initiative must be expressed in the initiative's title. (See *Perry v. Jordan, supra*, 34 Cal.2d at p. 93; see also *California Trial Lawyers Assn. v. Eu* (1988) 200 Cal.App.3d 351, 358 [245 Cal.Rptr. 916].) Thus, at the very least, an initiative should not pass muster under the single-subject rule unless its provisions are reasonably encompassed within the title and summary of the initiative. The inquiry is roughly analogous to a court's inquiry into whether a party was unfairly surprised by a provision in a contract of adhesion, rendering that provision unconscionable. (See *A & M Produce Co. v. FMC*

*Corp.* (1982) 135 Cal.App.3d 473, 490-491 [186 Cal.Rptr. 114].) Moreover, the subject encompassed by the title and summary should be reasonably specific, not a broad, generic subject such as crime or public disclosure. (See *Chemical Specialties Manufactures Assn., Inc. v. Deukmejian* (1991) 227 Cal.App.3d 663, 670-671 [278 Cal.Rptr. 128].)

*California Trial Lawyers Assn. v. Eu, supra,* 200 Cal.App.3d 351, illustrates the application of this test. There, an initiative that sought to establish a system of no-fault insurance with the purpose of lowering insurance rates also had a provision, section 8, guaranteeing to insurers and various other groups the same right to make campaign contributions as is given generally, and provided that state officials receiving such contributions would not be disqualified from " 'participating in any decision affecting the interest of the donor.' " (*Id.* at p. 356.) As the court stated: "In our view, section 8 of the initiative is a paradigm of the potentially deceptive combinations of unrelated provisions at which the constitutional limitation on the scope of initiatives is aimed. It is located . . . near the middle of a 120 page document, and consists of two brief paragraphs which bear no connection to what precedes or follows. . . . [¶] The significant threat that voters will be misled as to the breadth of the initiative is heightened by the absence of any reference to section 8 in the Attorney General's title and summary, or in the introductory statement of findings and purpose in the initiative itself . . . . [N]ot only is there a lack of any reasonably discernible nexus between the stated object of the initiative and the campaign spending and conflict of interest provisions of section 8, but the title and various descriptions of the initiative's contents give no clue that any such provisions are buried within. These flaws are fatal." (*Id.* at pp. 360-361.)

Finally, in addition to the test discussed above, an initiative would pass muster under the single-subject rule if it were "functionally related in furtherance of a common underlying purpose." (*Schmitz v. Younger, supra,* 21 Cal.3d at p. 100 (dis. opn. of Manuel, J.).) In *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 230-231 [149 Cal.Rptr. 239, 583 P.2d 1281], in which Proposition 13 was upheld as constitutional, this test was employed along with the reasonably-germane test. (See also *Brosnahan v. Eu* (1982) 31 Cal.3d 1, 9 [181 Cal.Rptr. 100, 641 P.2d 200] (dis. opn. of Mosk J.) [advocating adoption of the functionally-related test].) The functionally-related test would require that an initiative's various measures be "reasonably interrelated and interdependent, forming an interlocking 'package' " designed to accomplish the initiative's purpose. (*Amador Valley, supra,* 22 Cal.3d at p. 231.)

## II.

With these principles in mind, I turn to Proposition 21. I agree that the juvenile justice and gang-related provisions are reasonably germane to the single subject of preventing juvenile crime. The gang-related provisions would be popularly understood to be germane to the subject of juvenile crime since gang-related crime is often juvenile crime. This single subject is appropriately expressed in the title given by the Attorney General—"Juvenile Crime. Initiative Statute." (Ballot Pamp., Primary Elec. (Mar. 7, 2000) p. 44.) It is also expressed in the title given by the drafters of the initiative, the "Gang Violence and Juvenile Crime Prevention Act of 1998." (*Id.* at p. 119.) Moreover, these interrelated subjects are reasonably specific.

The third part of Proposition 21, concerning the amendment of the "Three Strikes" law by adding to the list of serious and violent felonies found in Penal Code sections 667.5 and 1192.7, presents a much closer question. As the majority correctly state: "The general object of the initiative is to address the problem of violent crime committed by juveniles and gangs—not simply to reduce crime generally." (Maj. opn., *ante,* at pp. 575-576.) Although some of the crimes added to the Three Strikes law are clearly gang related—such as extortion or threats in connection with gang activity and intimidation of victims or witnesses—some have no apparent relationship with either juvenile or gang-related crime. I disagree with the majority's argument that crimes such as first degree burglary or use of a firearm in connection with a felony are sufficiently related to the subject of juvenile and gang-related crime merely because *some* juveniles or gang members commit such crimes, even though the large majority of those committing these crimes are adults who are not members of gangs. Employing the popular-understanding test discussed above, it is highly doubtful that, for example, the general public would particularly associate first degree burglary with juveniles or gangs.

Moreover, the "significant threat that voters [were] misled as to the breadth of the initiative [was] heightened by the absence of any reference to [the provision] in the Attorney General's title and summary, or in the introductory statement of findings and purpose in the initiative itself." (*California Trial Lawyers Assn. v. Eu, supra,* 200 Cal.App.3d at p. 361.) Nothing in the title of Proposition 21 would have placed voters on notice that it would be amending the Three Strikes law, nor that some of the amendments would have only an incidental connection with juvenile or gang-related crime. Nor do the arguments for and against Proposition 21 contain any mention of these provisions. (Ballot Pamp., Primary Elec. (Mar. 7, 2000) pp. 48-49.) Likewise, the findings and declarations contained in section 2, subdivision (d) of the law make no mention of these amendments,

instead focusing on the increasing "problem of youth and gang violence." (*Id.* at p. 119.) The Attorney General's summary does mention that the initiative "[d]esignates additional crimes as violent and serious felonies, thereby making offenders subject to longer sentences." (*Id.* at p. 44.) But because that mention comes after the title and after the portions of the summary specifically related to juvenile and gang-related crime, it is doubtful that this reference would have placed the average voter on notice that the "offenders" in question are not necessarily, and in some cases are not *usually*, juveniles or gang members.

To counter these arguments, the majority point to the more extensive description of the initiative in the Legislative Analyst's summary and state, " 'We must assume the voters duly considered and comprehended these materials.' " (Maj. opn., *ante*, at p. 580.) But while it is to be hoped that voters carefully study their ballot guides, the realistic premise behind the single-subject rule is that many voters do not, and the ballot measures should be simple enough to be fairly well described in the title and summary. The less rigorously we enforce the single-subject rule, the more we are compelled to rely on implausible assumptions about voters' understanding of a ballot measure's intricacies.

This lack of notice to voters is especially troublesome because the Three Strikes law is itself a substantial and controversial piece of legislation, the amendment of which merits the careful attention of the voters. I note that there is currently circulating an initiative to amend the Three Strikes law so as to narrow the list of violent and serious felonies that will count as strikes. (See text of proposed initiative for Gen. Elec. Nov. 5, 2002, entitled "Three Strikes" Law. Limitation to Violent and Serious Felonies. Initiative Statute (Cal. Sec. of State, 2002 Initiative Update <http.www.ss.ca.gov/elections/elections_j.htm> [as of Feb. 28, 2002].) There is therefore cause for concern that the amendments to the controversial Three Strikes law were tacked on to a popular anti-juvenile-crime initiative as a form of improper logrolling—a practice the single-subject rule was designed to prevent.

Nonetheless, I concur in the result because I agree that there is a functional relationship between the juvenile justice provisions and the amendment of Penal Code sections 667.5 and 1192.7. Welfare and Institutions Code section 1732.6, subdivision (a) provides that "[n]o minor shall be committed to the Youth Authority when he or she is convicted in a criminal action" of any of the violent or serious felonies set forth in the above two Penal Code sections. As the majority explains, Proposition 21 amends Welfare and Institutions Code section 1732.6 to add additional offenses, enumerated in Welfare and Institutions Code sections 602 and 707, under

which a minor would be precluded from being committed to the Youth Authority. But these amendments did not alter the role that Penal Code sections 667.5 and 1192.7 offenses have in determining which minors would not be committed to the Youth Authority.

In other words, a critical determination in the juvenile justice system—whether or not a minor will be committed to the Youth Authority or to prison—depends in part on the nature of the crimes defined by Penal Code sections 667.5 and 1192.7. In this sense, the amendment of these two statutes is also an amendment of Welfare and Institutions Code section 1732.6 and is therefore functionally related to the goal of the initiative—the reform of the juvenile justice system to impose greater punishment on some juveniles who have committed crimes. This interlocking, functional relationship between Welfare and Institutions Code section 1732.6 and Penal Code sections 667.5 and 1192.7, more than any tenuous topical connection, persuades me that the amendment of these latter two sections is fairly included in the subject of juvenile justice reform. For that reason, I conclude Proposition 21 does not violate the single-subject rule.

**KENNARD, J.,** Dissenting—Historically, in California the decision whether to grant a district attorney's request that a minor be prosecuted in adult court instead of juvenile court has been a function of the judiciary, a neutral body. In 2000, however, the voters of this state enacted Proposition 21, an initiative measure that among other matters grants a prosecutor arbitrary and virtually unlimited discretion to decide whether a minor should be tried in juvenile or adult court. There is no hearing, and no right to counsel. No standards guide the exercise of discretion. There is no judicial review. This last omission is fatal, for by depriving the judiciary of any role in making or reviewing the decision, this portion of Proposition 21 eliminates an essential check to arbitrary executive power, and thus offends the principle of separation of powers embodied in the California Constitution.

I

The California Constitution expressly provides for the separation of governmental powers among the three branches of state government. (Cal. Const., art III, § 3.) "Although this particular provision dates only from 1972, our state Constitution '[f]rom its inception . . . has contained an explicit provision embodying the separation of powers doctrine.' " (*Obrien v. Jones* (2000) 23 Cal.4th 40, 65 [96 Cal.Rptr.2d 205, 999 P.2d 95] (dis. opn. of Kennard, J.), quoting *Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 52 [51 Cal.Rptr.2d 837, 913 P.2d 1046].)

" ' "[T]he separation of powers principle does not command 'a hermetic sealing off of the three branches of Government from one another.' " ' " (*Obrien v. Jones, supra,* 23 Cal.4th at p. 48, quoting *In re Attorney Discipline System* (1998) 19 Cal.4th 582, 602 [79 Cal.Rptr.2d 836, 967 P.2d 49].) It is expressed, instead, in a system of checks and balances intended to prevent any branch from attaining arbitrary or inordinate power. This court in *Superior Court v. County of Mendocino, supra,* 13 Cal.4th at pages 52-53, stated: "Although the language of California Constitution article III, section 3, may suggest a sharp demarcation between the operations of the three branches of government, California decisions long have recognized that, in reality, the separation of powers doctrine ' "does not mean that the three departments of our government are not in many respects mutually dependent" ' [citation] . . . . Indeed, upon brief reflection, the substantial interrelatedness of the three branches' actions is apparent and commonplace . . . . Such interrelationship, of course, lies at the heart of the constitutional theory of 'checks and balances' that the separation of powers doctrine is intended to serve."

The charging power of the district attorney, which the majority cites as an exclusive executive power, illustrates the point. The legislative branch defines those crimes that can be charged, the executive branch decides what crimes to charge, and the judicial branch decides whether to sustain those charges. Before the electorate enacted Proposition 21, a similar system of checks and balances protected the decision whether a minor should be prosecuted as a juvenile or as an adult. Most actions against juveniles had to begin in the juvenile court. (See Welf. & Inst. Code, former § 602, as amended by Stats. 1976, ch. 1071, § 12, p. 4819.)[1] The prosecution, in its discretion, could seek to have the proceeding transferred to adult court. (§ 707, subd. (a).) The juvenile court would hold a hearing and, applying standards established by the Legislature, rule on the prosecutor's request. (§ 707.)

Proposition 21 seeks to eliminate the required checks and balances. It amended section 602, subdivision (b), declaring some minors statutorily ineligible for juvenile court proceedings. That provision raises no separation of powers issues. But as to those minors who could be prosecuted in either adult court or juvenile court, it allows the prosecutor to make that decision unrestrained by any legislatively prescribed standards and without judicial review. If the decision is to prosecute in adult court, and it later appears that the juvenile court would have been more appropriate, the minor has no remedy because the judicial branch is excluded from the determination. This

---

[1]Unless otherwise designated, all statutory citations are to the Welfare and Institutions Code.

portion of Proposition 21, in my view, conflicts with the constitutional mandate.

The juvenile court system and the adult criminal courts serve fundamentally different goals. The punishment for serious crimes tried in the criminal courts is imprisonment, and "the purpose of imprisonment for crime is punishment." (Pen. Code, § 1170, subd. (a)(1).) California Rules of Court, rule 4.410 identifies seven objectives in sentencing a criminal defendant. They include punishment, deterrence, isolation, restitution, and uniformity in sentencing, but they do not include goals important in the treatment of juvenile offenders such as maturation, rehabilitation, or preservation of the family.

In contrast, the juvenile court system seeks not only to protect the public safety, but also the youthful offender. Section 202, subdivision (a) states that the purpose of the juvenile court system is "to provide for the protection and safety of the public and each minor under the jurisdiction of the juvenile court and to preserve and strengthen the minor's family ties whenever possible . . . ." The statute further provides that "[w]hen the minor is removed from his or her own family, it is the purpose of this chapter to secure for the minor custody, care, and discipline as nearly as possible equivalent to that which should have been given by his or her parents." (*Ibid.*) Indeed even for the most serious offenders—those who will be committed to the California Youth Authority—"community restoration, victim restoration, and offender training and treatment shall be substituted for retributive punishment and shall be directed toward the correction and rehabilitation of young persons who have committed public offenses." (§ 1700.)

The practical consequences are immense. An adult court may sentence a defendant to life imprisonment; a juvenile court cannot impose confinement beyond the age of 25. (§§ 607, subd. (b), 1769.) Adult convictions are public but juvenile commitments are sealed (*T.N.G. v. Superior Court* (1971) 4 Cal.3d 767, 778 [94 Cal.Rptr. 813, 484 P.2d 981]; 1 Cal. Juvenile Court Practice (Cont.Ed.Bar 1981) § 13-7, p. 337), a difference that affects future employability and many other matters. Adult convictions are criminal in character, and may deprive the person convicted of the right to vote (Cal. Const., art. II, § 4), to serve on a jury (Code Civ. Proc., § 203), to carry firearms (Pen. Code, § 12021) and to enter certain professions (e.g., Gov. Code, § 1029 [peace officers]); juvenile convictions carry no such collateral consequences. Finally, by filing in adult court the prosecutor deprives the juvenile of the varied rehabilitative programs available in juvenile court.

## II

Concern with the danger in granting arbitrary power to a person who acts as an advocate, not as an impartial adjudicator, was the underpinning of this court's decision in the leading case on separation of powers, *People v. Tenorio* (1970) 3 Cal.3d 89 [89 Cal.Rptr. 249, 473 P.2d 993]. There, this court overruled *People v. Sidener* (1962) 58 Cal.2d 645 [25 Cal.Rptr. 697, 375 P.2d 641], which had upheld Health and Safety Code former section 11718's provision prohibiting a court from dismissing the allegation of a prior conviction without the prior approval of the prosecution. *Tenorio* relied heavily on the dissenting opinions in *Sidener* in concluding Health and Safety Code former section 11718 violated the separation of powers doctrine. It quoted Justice B. Rey Schauer's dissent, observing that he viewed *Sidener* as " 'a step toward totalitarian concentration of power in the executive; a power to be exercised without any legislative standard and without possibility of judicial review.' " (*People v. Tenorio, supra,* 3 Cal.3d at p. 93, quoting *People v. Sidener, supra,* 58 Cal.2d at p. 673 (dis. opn. of Schauer, J.).) *Tenorio* also cited Justice Thomas White's dissent, which stressed the district attorney's status as an advocate, and argued that vesting such an advocate with unreviewable power to preclude an order striking priors, " 'without any impartial tribunal to review his decision . . . seems . . . to do violence to our concept of constitutional government, and offends our oft repeated and proud boast that we are a government of laws and not of men.' " (*People v. Tenorio, supra,* at p. 94, quoting *People v. Sidener, supra,* 58 Cal.2d at p. 675 (dis. opn. of White, J.).) Distinguishing valid statutes conferring discretion on the Adult Authority (the predecessor of the Department of Corrections), *Tenorio* noted that in contrast to those statutes, "the discretion section 11718 purports to vest in prosecutors is *unreviewable*, and may therefore be exercised in a totally arbitrary fashion both in individual cases and by the adoption of county-wide policies precluding dismissal of priors regardless of the circumstances of individual cases." (*Tenorio,* at p. 95, italics added.)

We expressed the same concerns in *Esteybar v. Municipal Court* (1971) 5 Cal.3d 119 [95 Cal.Rptr. 524, 485 P.2d 1140], which held unconstitutional a statute (Pen. Code, § 17, former subd. (b)(5)) that required prosecutorial consent before a magistrate could determine that an offense was a misdemeanor. *Esteybar* said: "[S]ection 17, subdivision (b)(5), purports to vest in the prosecutor, admittedly an advocate, a power which may be exercised in a totally arbitrary fashion without regard to the circumstances of individual cases. Indeed, the prosecutor in the instant case admitted that it was a county-wide policy of the district attorney's office to refuse to consent to the prosecution of such offenses as misdemeanors unless the defendant first

agreed to plead guilty. Under our system of separation of powers, we cannot tolerate permitting such an advocate to possess the power to prevent the exercise of judicial discretion . . . ." (*Esteybar, supra,* at pp. 125-126, fn. omitted.)

This court relied on *Tenorio* and *Esteybar* in deciding the companion cases of *People v. Superior Court (On Tai Ho)* (1974) 11 Cal.3d 59 [113 Cal.Rptr. 21, 520 P.2d 405] (*On Tai Ho*) and *Sledge v. Superior Court* (1974) 11 Cal.3d 70 [113 Cal.Rptr. 28, 520 P.2d 412] (*Sledge*). *On Tai Ho* invalidated Penal Code section 1000.2, which required the prosecutor to consent to the diversion of a first time drug offender into a rehabilitation program. Rejecting the contention that the consent requirement did not invade the judicial sentencing power because diversion occurred before sentencing, we said: "Our decision in *Esteybar* teaches that the issue whether a power is judicial in nature depends not on the procedural posture of the case but on the substance of the power and the effect of its exercise. . . . At whatever stage such [prosecutorial] intervention occurs . . . it is an integral step in the process leading to the disposition of the case before the court, and therefore constitutes an exercise of judicial authority within the meaning of the constitutional doctrine of separation of powers." (*On Tai Ho, supra,* at p. 68.)

*Sledge* involved a different section of the same drug diversion law. Penal Code section 1000, subdivision (a)(3), authorized the district attorney to make the initial determination whether a defendant was eligible for diversion. We distinguished *On Tai Ho* and upheld the statute, because it provided for *judicial review* of a decision by the district attorney that a defendant was ineligible for diversion. (*Sledge, supra,* 11 Cal.3d at pp. 75-76.)

The majority here, however, relies on *Davis v. Municipal Court* (1988) 46 Cal.3d 64 [249 Cal.Rptr. 300, 757 P.2d 11] (hereafter *Davis*), which, like *On Tai Ho* and *Sledge*, involved a diversion statute. San Francisco had established a diversion program, but it provided that diversion was possible only for persons charged with misdemeanors. This provision had the effect of giving the district attorney unreviewable discretion, whenever a defendant was charged with a "wobbler" (a crime that can be either a felony or a misdemeanor), to exclude that defendant from diversion by the device of filing the charge as a felony. The *Davis* majority upheld this practice, distinguishing this court's earlier decisions in *People v. Tenorio, supra,* 3 Cal.3d 93, and later cases on the ground that all of the prior cases concerned prosecutorial action after charges had been filed. (*Davis,* at p. 82.) The separation of powers doctrine, *Davis* said, limits only prosecutorial action during the " 'judicial phase' " of a criminal proceeding. (*Id.* at p. 85.) The majority here adopts that reasoning, holding that decisions occurring before

the filing of charges fall under the prosecutor's traditional charging discretion, regardless of their effect on later judicial proceedings. (Maj. opn., *ante*, at pp. 552-553.)

*Davis* is factually distinguishable from this case. In *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 [53 Cal.Rptr.2d 789, 917 P.2d 628], this court noted that *Davis* involved diversion, and "[t]he design of diversion programs is not historically, or necessarily, a judicial function." (*Id.* at p. 517.) Thus we concluded that *Davis* was not relevant to the trial court's power to strike a prior conviction, a power that has historically been exercised by the judiciary. The same distinction could apply here, for unlike the design of diversion programs, but akin to the power to strike a prior conviction, the decision whether to prosecute a minor in adult or juvenile court has been historically a judicial function. That power has rested exclusively in the hands of the juvenile court from 1915 (see Stats. 1915, ch. 631, § 2, p. 1225), shortly after the Legislature established the juvenile court system in 1909 (see *People v. Navarro* (1972) 7 Cal.3d 248, 277 [102 Cal.Rptr. 137, 497 P.2d 481]; Juvenile Court Act, Stats. 1909, ch. 133, p. 213), until the voters enacted Proposition 21 in 2000.

Although the result in *Davis* might be defended on the ground that the prosecutorial action involved did not invade a historically judicial function, its analysis is unsound. *Davis* reasoned that because a court acquires jurisdiction with the filing of charges, nothing that happens before the filing of charges could constitute an invasion of the judicial powers. Three justices dissented in *Davis*; in my view, they have the better of the argument. Justice Stanley Mosk disagreed that the separation of powers issue depended on the timing of the prosecutor's action. As the author of *On Tai Ho, supra*, 11 Cal.3d 59, and *Sledge, supra*, 11 Cal.3d 70, he explained that "those cases turn not on a simple chronological distinction between the 'charging stage' of a case and the point at which the case is 'before the court,' but rather on the character and consequence of the decision placed in the hands of the district attorney." (*Davis, supra*, 46 Cal.3d at p. 90 (dis. opn. of Mosk, J.).) Justice Marcus Kaufman, joined by Justice Edward Panelli, focused on the arbitrary and unreviewable discretion given the district attorney: "[T]he diversion program effectively grants the district attorney unbridled discretion to determine who among those committing wobblers shall be conditionally eligible for diversion and who shall be absolutely ineligible. . . . [¶] . . . [W]hen the executive's exercise of the charging function *also* constitutes the exercise of delegated legislative power, as it does in this case, that power must be circumscribed by 'suitable safeguards . . . to guide the power's use and to protect against misuse' [citation], or it cannot be upheld." (*Id.* at p. 95 (dis. opn. of Kaufman, J.).)

Under the reasoning of *Davis, supra,* 46 Cal.3d 64, and the majority opinion here, the Legislature (or the electorate by initiative) can effectively abrogate all of our previous decisions on separation of powers. For example, *People v. Tenorio, supra,* 3 Cal.3d 89, invalidated a law that permitted the prosecutor to veto a court order dismissing a prior conviction, but under the majority's reasoning the Legislature could nullify *Tenorio* by allowing the prosecutor to specify in the charging papers that certain prior conviction allegations will not be subject to dismissal, and by making that decision binding on the court. Another separation of powers decision, *Esteybar v. Municipal Court, supra,* 5 Cal.3d 119, said that principle was violated by a law requiring prosecutorial consent before a magistrate could order that a crime be prosecuted as a misdemeanor; under the majority's holding, the Legislature could simply authorize the prosecutor, in the charging papers, to specify whether the magistrate could treat the offense as a misdemeanor. A third decision, *On Tai Ho, supra,* 11 Cal.3d 59, held invalid a statute requiring prosecutorial consent to diversion; under the majority's holding the Legislature could simply prohibit diversion unless the prosecutor, in the charging papers, has consented. Indeed, the rationale of *Davis* and the majority here would permit the enactment of a statute that authorized the prosecutor to make binding and unreviewable determinations, before or at the time of filing charges, as to what judge will hear the case, what evidence will be admitted, and what sentence imposed if the defendant is convicted, thus effectively abrogating the function of the separation of powers doctrine.

### III

The majority asserts that because the Legislature has the power to eliminate entirely the jurisdiction of the juvenile court, a statute that confers authority on the prosecutor to bypass that jurisdiction does not usurp an exclusive judicial authority. (Maj. opn., *ante,* at p. 560.) This is a familiar argument, because it has been repeatedly raised and rejected in separation of powers cases. In *Esteybar v. Municipal Court, supra,* 5 Cal.3d 119, the People argued that because the Legislature was not required to give magistrates the power to determine that a charge should be prosecuted as a misdemeanor, the Legislature could condition this power on the consent of the prosecutor. We responded: "[This] argument[] . . . [is] not persuasive. . . . [T]he fact that a particular power has been conferred on a magistrate by statute does not prevent the exercise of that power from being a judicial act for purposes of the doctrine of separation of powers." (*Id.* at pp. 126-127; see *People v. Tenorio, supra,* 3 Cal.3d at p. 94.) And in *People v. Superior Court (Romero), supra,* 13 Cal.4th at page 516, we observed that even though the Legislature had the power to abolish judicial discretion to strike a prior conviction allegation, that did not give it the authority to condition that power on the consent of the district attorney.

## IV

In my view, Proposition 21 unconstitutionally invaded a judicial function, for the following reasons:

First, almost from the inception of the juvenile court system in California, the decision whether a minor is unfit for juvenile court proceedings has been a judicial function. History alone may not be conclusive (see maj. opn., *ante*, at pp. 557-558), but it is important, for the division of authority among the three coequal branches of government is largely a product of history.

Second, the decision whether to prosecute in juvenile or adult court is critical, and thus deserving of the due process protections of a judicial proceeding. In *Kent v. United States* (1966) 383 U.S. 541 [86 S.Ct. 1045, 16 L.Ed.2d 84], the United States Supreme Court reviewed an arbitrary ruling of the District of Columbia juvenile court to waive jurisdiction and permit trial in adult court. Overturning that ruling, the high court repeatedly described the decision whether a minor should be tried as a juvenile or an adult as "critically important" (*id.* at pp. 553, 556, 558, 560, 561 [86 S.Ct. at pp. 1053, 1055, 1056, 1057]), one of "tremendous consequence" (*id.* at p. 554 [86 S.Ct. at pp. 1053-1054]), and thus deserving and requiring the protection of due process. (*Ibid.*) *In re Harris* (1967) 67 Cal.2d 876, 878 [64 Cal.Rptr. 319, 434 P.2d 615], noted: "In *Kent v. United States*[, *supra*,] 383 U.S. 541, [553], the Supreme Court held that a juvenile court's direction that a minor be held for trial as an adult must be based on a hearing that conforms to 'the basic requirements of due process and fairness. . . .'" *People v. Chi Ko Wong* (1976) 18 Cal.3d 698, 718 [135 Cal.Rptr. 392, 557 P.2d 976], said: "It cannot be denied that the process of certifying a juvenile for criminal proceedings is a critically important action affecting vitally important rights of the juvenile. . . . The certification process must . . . be attended by minimum requirements of due process and fair treatment as dictated by the Fourteenth Amendment." (See *Edsel P. v. Superior Court* (1985) 165 Cal.App.3d 763, 775 [211 Cal.Rptr. 869].)

These cases do not suggest that the critically important decision whether to try the minor in adult or juvenile court should receive due process protections only if it is made after charges have been filed. Yet if the same decision, equally important and consequential, is made before charges are filed, then, according to the majority, the prosecutor has unreviewable discretion, subject only to the most minimal of constitutional constraints prohibiting invidious discrimination or vindictive or retaliatory prosecution. (Maj. opn., *ante*, at pp. 570-571.) There is no judicial review to correct

erroneous decisions, inconsistent decisions, or decisions that certain classes of minors, or all minors, will always be prosecuted in adult court.

Third, at the time of filing charges, the district attorney's office has limited information—the details of the particular crime, and the minor's prior criminal history, if any. It may not know the minor's family, school, or community history, all matters that are important in deciding whether the minor is suitable for juvenile court treatment. It may not know the minor's view of the matter, and probably has not heard from the minor's counsel, who has yet to be appointed. There has been no hearing, no testimony, and no receipt of evidence. As a result, the prosecutor, acting with limited information, may err in the decision, and although an error in submitting the minor to juvenile court jurisdiction is correctable, one in assigning the minor to adult court is not.

## V

The separation of powers doctrine does not require that the prosecutor take no part in the decision whether a minor should be tried in adult or juvenile court. Because that doctrine envisions that each branch of government acts as a check upon the power of the other branches, the doctrine of separation of powers would be satisfied if the prosecutor's initial decision were subject to judicial review. *Tenorio*, in striking down a statute requiring approval of the prosecutor to dismissal of a prior conviction allegation, repeatedly emphasized the *absence of judicial review*, suggesting that judicial review would have saved the statute. (See *People v. Tenorio, supra*, 3 Cal.3d 89, 93-95.) This was confirmed in *On Tai Ho, supra*, 11 Cal.3d 59, and *Sledge, supra*, 11 Cal.3d 70, which concerned parallel provisions giving prosecutors power to disapprove drug diversion—*On Tai Ho* held invalid a provision that did not provide for judicial review, *Sledge* upheld a similar provision because it provided for judicial review. As the majority acknowledges, court decisions in other states upholding laws similar to section 707, subdivision (d) in all but one instance involved laws permitting judicial review. (See cases cited in maj. opn., *ante*, at pp. 561-562.)

## VI

In conclusion, the validity of Proposition 21's provision giving the prosecutor power to decide whether to prosecute a minor in adult court or juvenile court turns not on the timing of the prosecutor's decision, but "the substance of the power and the effect of its exercise." (*On Tai Ho, supra*, 11 Cal.3d at p. 68.) The power, as I have explained, is unrestrained by legislative standards and susceptible to arbitrary exercise; the effect is profound,

determining whether the minor will be prosecuted in a system that stresses punishment or one that stresses rehabilitation. In this setting, the absence of judicial review brings that portion of Proposition 21 into conflict with article III, section 3 of the California Constitution.

The petition of real party in interest for a rehearing was denied April 17, 2002, and the opinion was modified to read as printed above.